HENRY HOMPES, APPELLEE, V. B. F. GOODRICH COMPANY
ET AL., APPELLANTS.
288 N. W. 367

FILED NOVEMBER 10, 1939. No. 30533.

*Flansburg & Flansburg* and *F. C. Leslie,* for appellants.

*Beghtol, Foe & Rankin, Walter E. Nolte* and *Lawrence Vold, contra.*

Heard before ROSE, EBERLY, PAINE, CARTER, MESSMORE and JOHNSEN, JJ., and LANDIS, District Judge.

CARTER, J.

This is an action brought by the plaintiff, Henry Hompes, against the B. F. Goodrich Company and others under the Junkin Act (Comp. St. 1929, secs. 59-801 to 59-822) for damages alleged to have resulted from a conspiracy of the defendants, in restraint of trade, to exclude the plaintiff from dealing in Goodrich products and to monopolize a part of the trade and commerce of the state. From a verdict and judgment for $25,000, the defendants appeal.

The record shows that since 1925, under the trade-name of Hompes Tire Company, plaintiff has been conducting a business in the city of Lincoln of warehousing and selling Goodrich automobile tires, tubes and accessories manufactured by the B. F. Goodrich Company; that, as a part of the business, plaintiff erected a building at a cost of $133,000 in which to carry on his business, expended large amounts for equipment, and set up an organization of salesmen and dealers for selling Goodrich products, which resulted in the establishment of a profitable business.

Plaintiff claims that, prior to 1933, the defendant B. F.

Goodrich Company entered into a conspiracy with other defendants to induce plaintiff to invest large sums of money in the establishment of his business, and then to compel him to give it up so that the benefits thereof would accrue to the B. F. Goodrich Company. The specific acts alleged to have been committed, and which plaintiff claims are sufficient to establish a conspiracy, may be summarized as follows: (1) That the Goodrich Company sold its tires to competitors and customers of plaintiff in Lincoln at a lower price than they were sold elsewhere. (2) That the Goodrich Company limited the price at which plaintiff could sell its products, but placed no limit on competitors. (3) That the Goodrich Company sent salesmen into Lincoln to destroy sales under negotiation by plaintiff. (4) That, in violation of their contract, they shipped products within plaintiff's territory without passing the same through plaintiff's warehouse, so as to deprive him of his commission thereon. (5) That defendants refused to complete sales of tires made by plaintiff in the city of Lincoln. (6) That defendant Goodrich Company organized the State Tire Company of Lincoln to compete with plaintiff in the sale of tires, which corporation was owned by the defendant conspirators. (7) That the Goodrich Company organized similar stores in Beatrice and Fairbury to aid in the accomplishment of their unlawful purpose. (8) That the Goodrich Company threatened to and did refuse to deal with plaintiff on and after February 10, 1936, for the purpose of carrying out the conspiracy of the defendants to drive the plaintiff out of business for their benefit.

The relationship between the Goodrich Company and plaintiff was, at all times herein mentioned, evidenced by certain written contracts and agreements which were renewed from year to year, until the cancelation of the 1936 contract took place. It is necessary that the nature of these contracts be investigated before a proper understanding of the evidence can be had.

Plaintiff had a five-year contract dated November 14, 1935, with the Goodrich Company in which he agreed to

purchase his requirements of Goodrich products. This agreement provided that plaintiff should pay regular dealer prices less a 2 *per centum* cash discount if paid before the tenth of the following month. The balance of the contract pertained to advertising, sales efforts, deliveries, adjustments and other matters incidental to the business. It was specifically provided that the matter of bonus credits for volume purchases was not a part of the contract, the contract stating that the bonus credit for volume was in the nature of a reward subject to cancelation or revision at any time. A rider accompanied the contract, however, in which the schedule of credits for volume was set forth. These riders were apparently sent out on November 1 of each year with instructions to attach to the dealer's contract.

Plaintiff and the Goodrich Company also entered into a "Dealer Warehouse Agreement" in 1930 and each succeeding year thereafter, the general provisions of which were substantially the same. The provisions with reference to the allowance of warehouse commissions are as follows: "For our faithful performance of the terms and provisions of this agreement, you agree to pay to us on all merchandise delivered under this agreement from your warehouse stock to your customers on the list which you furnish us, a commission amounting to five (5) per cent. of the actual invoice value of such merchandise, less all discounts shown on the invoices, including two (2) per cent. allowed for cash, said commission to be paid monthly in the form of a merchandise credit. No commission will be paid on merchandise drawn from your stock stored with us and delivered to ourselves or shipped by us to your other branches or to dealers not on your customers' list on file with us, except when such deliveries to customers not on your list are made by us at your request. No commission will be paid on any deliveries made from our stock to your customers or branches. In the event of goods being returned by your customers, the commission on the original sale will be deducted from the commission to be paid to us."

It will be noted that the "Dealer Warehouse Agreement" does not purport to give plaintiff a commission on all products sold within a designated territory. It in fact provides for a commission of 5 per cent. on all merchandise delivered from plaintiff's warehouse to Goodrich customers on a list to be provided by the company, said list being described in another section of the contract as one containing customers whose credit ratings met the requirements of the company. Commissions were to be paid on shipments to others only after approval by the branch office of the Goodrich Company. All commissions, however, are limited to deliveries made from the plaintiff's warehouse. It is the contention of plaintiff, however, that the construction placed upon the contract by the parties themselves requires a different conclusion. The provisions of the contract appear to be so definite and unambiguous that we doubt if they are subject to construction. *Farmers Ed. and Coop. Union v. Farmers Ed. and Coop. State Union,* 133 Neb. 397, 275 N. W. 464; *Crancer v. Reichenbach,* 130 Neb. 645, 266 N. W. 57; *James Poultry Co. v. City of Nebraska City,* 135 Neb. 787, 284 N. W. 273. But even if so, the evidence does not show that plaintiff was paid commissions on products which were not delivered from his warehouse. The evidence does show that on June 6, 1934, credit was allowed the plaintiff for commissions in the amount of $28.55 on products delivered from the Omaha branch. Officers of the company were unable to account for this credit, and assumed that it was due to mistake. In view of the fact that the officers of the company at all times refused to grant such credits to the plaintiff, and in view of the fact that their position was in accord with the terms of the contracts entered into each year, we. hold that one credit of $28.55, among a huge number of business transactions, is insufficient to sustain a finding of liability based on mutual subsequent interpretation of the contract. The record further shows that one Lawrence Goodale, a salesman of the Fisk Tire Company who sells the products of that company to plaintiff, and who was for many years a busi-

ness associate of the plaintiff, testified that during a part of the times mentioned he was a representative of the Goodrich Tire Company, engaged in the selling of Goodrich products in the territory served by the Hompes Tire Company warehouse. The substance of his testimony was that Goodrich products were sold in the territory serviced by the Hompes Tire Company, which were not delivered from plaintiff's warehouse, and that Hompes was paid a warehouse commission on such sales. Other than the one credit hereinbefore noted, the books, credit slips and other records of the Goodrich Company and Hompes Tire Company do not in any way corroborate this statement. No foundation was laid for the admission of this evidence. In so far as the record shows, the witness merely expressed an opinion without a factual foundation sufficient to warrant its admission. The testimony of the officers of the Goodrich Company denies that commissions were paid to plaintiff on products not delivered from his warehouse. We must necessarily conclude that plaintiff failed to sustain the burden of proof on this point. The trial court submitted these claims for commissions to the jury as an element of damage. We think the trial court should have withdrawn these items from the consideration of the jury and that the failure to so do constitutes prejudicial error.

It is the contention of plaintiff that the Goodrich Company organized, owned and controlled the State Tire Company of Lincoln and the State Tire Company of Beatrice, which with W. G. Sabine, the Goodrich Company's branch manager at Omaha, conspired with the Goodrich Company to destroy the business of the plaintiff by diverting it to these company-controlled stores. Evidence was offered in an attempt to show that the company-controlled stores received Goodrich products at a lower price than plaintiff, thus enabling the company-controlled stores to undersell plaintiff.

It is established by the record that Goodrich products were sold to the company-controlled stores at the same price they were sold to plaintiff. Each was allowed the same

cash and factory shipment discounts. Plaintiff was allowed his 5 per cent. discount on products delivered from his warehouse. The contention that favoritism was shown arises from the allowance of a volume discount. In this respect, both the company-controlled stores and plaintiff had the same volume discount schedule. Plaintiff's volume discount was fixed by adding together the output of all of his outlets. In determining the volume discount of the company-controlled stores, the output of all of them was added together, which naturally resulted in their receiving the maximum volume discount. The plaintiff was unable to reach the maximum, and as a result obtained a lesser volume discount. The allowance of a volume discount is not of itself a violation of the Junkin Act. If the purpose of the discount was to make it possible to unlawfully undersell the plaintiff and assist in carrying out the unlawful conspiracy or combine, a liability would, however, be established. It is necessary that the evidence concerning the granting of more favorable discounts to the company-controlled stores be examined with a view of determining whether they were granted for a purpose prohibited by the Junkin Act. In so considering it, we are not unmindful of the rule announced in *Marsh-Burke Co. v. Yost*, 98 Neb. 523, 153 N. W. 573, wherein we said: "A conspiracy need not be established by direct evidence of the acts charged, but may, and generally must be, proved by a number of indefinite acts, conditions and circumstances, which vary according to the purpose to be accomplished. If it be proved that defendants, by their acts, pursued the same object, although by different means, one performing one part and another another part, with a view to the attainment of the same object, the jury will be justified in the conclusion that they were engaged in a conspiracy to effect that object."

The evidence shows that the volume discounts allowed the company-controlled stores were in accordance with a long-established business practice of the Goodrich Company, and they knowing full well that the added volume of

all the company-controlled stores would exceed the amount required for the maximum volume discount, it was customary to grant such discounts as payments on their accounts were made. The question immediately arises whether the discounts were in fact allowed to permit the company-controlled stores to undersell plaintiff and still make a profit. The evidence is clear that plaintiff and the company-controlled stores were furnished identical retail price lists, which all were obligated to follow. Evidence was produced which showed that the State Tire Company of Lincoln had sold Goodrich products at a price lower than the one prescribed. It was subsequently established that these sales were in accordance with the National Recovery Act code price which had abrogated the company retail price list. Evidence was also produced that plaintiff, during the same period, was selling at the identical price established as the code price. It is equally clear to us that the amount of discounts allowed the company-owned stores becomes unimportant if such stores were actually owned by the Goodrich Company. It has never been held in this state that it was unlawful to favor one's self. This is particularly true where the retail price has been maintained and no underselling indulged in by the subsidiary agency. Since retail prices were uniformly maintained by the company-controlled stores, it cannot be said that the allowance of a larger discount for a larger volume of sales is a violation of the provisions of the Junkin Act.

Complaint is made that the establishment of the company-controlled stores was in violation of plaintiff's contract with the Goodrich Company and also a violation of the provisions of the Junkin Act. The evidence shows that plaintiff did not have an exclusive contract to warehouse, or sell at wholesale or retail, the products of the Goodrich Company. The 1936 warehouse contract provided that either party could terminate the contract on five days' notice. The dealer's contract provided for a cancelation on five days' notice if plaintiff's account became delinquent. The evidence shows that plaintiff was requested to provide further

outlets for Goodrich products in Lincoln, and he refused. The evidence further shows that he acquiesced in the establishment of the State Tire Company in Lincoln, that he aided in locating it and celebrated its opening by giving a party at his home. The evidence also shows that he advertised jointly with the State Tire Company for a period of time. It is true that plaintiff says an oral agreement was entered into that the merchandise for the State Tire Company was to be delivered from his warehouse, but we are obliged to say, without discussing all the evidence on the subject, that plaintiff failed to sustain this contention by the burden of proof. In fact, the written contracts between plaintiff and the Goodrich Company, entered into subsequent to the opening of the State Tire Company store, negative this contention. It is not even contended that the State Tire Company was placed on the list of dealers to be serviced from plaintiff's warehouse. A consideration of the evidence, both written and oral, convinces us that the Goodrich Company not only could lawfully establish an additional retail store in Lincoln, but that the plaintiff acquiesced in its so doing. The evidence shows that volume discounts allowed were in accordance with uniform schedules provided to all dealers and were not directed specifically at the plaintiff. We conclude from the evidence that the defendants did not conspire to injure plaintiff in a program of underselling. It is true that the retail price established by the Goodrich Company was departed from due to the functioning of the National Recovery Act and the meeting of competitive prices in the Lincoln community, but this cannot be said to be unlawful. It is established by the evidence that, while a uniform retail price list was furnished all Goodrich dealers, special discounts were allowable to certain classes of consumers by all dealers. As an example, any dealer could allow an additional discount to a county or the state, or to a national account customer. Reduced prices were at all times permitted to meet competition in the open market. Such discounts being permitted to all Goodrich dealers uniformly to meet like prices of competi-

tors of similar products cannot be said to be in violation of the Junkin Act.

In the final analysis of the situation, it is not material what business methods and practices are employed by a company and its subsidiary branches as between themselves. The real question is, what the branch does to its competitors and the public, and the fixing of the company's responsibility for wrongs committed by a subsidiary or branch owned and controlled by it.

There is evidence in the record that plaintiff became dissatisfied with his contracts with the Goodrich Company, and negotiated with a major competitor of the Goodrich Company for more favorable ones. Upon their procurement he demanded like terms from the Goodrich Company, and stated that unless they were granted he desired to abrogate existing contracts with the Goodrich Company. Plaintiff refused to pay his account until his demands were met, and as a result his account became past due and his dealer's contract subject to cancelation on five days' notice. The Goodrich Company refused his demands, and, in accordance with plaintiff's expressed desire, served the required notice preliminary to the cancelation of the contracts. We fail to see where the cancelation of the contracts in accordance with their very terms can operate to create a liability against the defendants, either by contract or under the Junkin Act.

The contentions of the plaintiff that the Goodrich Company sent salesmen into Lincoln to destroy sales under negotiation by the plaintiff is not sustained by the evidence. Nor is there evidence to sustain a finding that the Goodrich Company wilfully refused to complete sales of tires made by the plaintiff in the city of Lincoln. It must be borne in mind that plaintiff did not have an exclusive contract to sell tires at retail or wholesale in the city of Lincoln. So long as the Goodrich Company, or its subsidiary, the State Tire Company, competed for business by the usual methods without any attempt to injure the plaintiff by stifling competition, it cannot be said that the Junkin Act

has been violated. An examination of the record does not disclose that the defendants pursued any different business policy with plaintiff than they did with any other dealer or warehouseman engaged in the tire business. While each of the acts of defendants were in themselves lawful, such lawful acts accompanied by an ulterior motive might be actionable. We must, therefore, look into the evidence bearing upon the question of intent.

Plaintiff contends that a statement contained in a letter from the defendant W. G. Sabine to F. C. Leslie, manager of the legal department of the Goodrich Company, shows the ulterior motives of the defendants. The statement is: "Nevertheless, Firestone, Goodyear and U. S., I am well satisfied, have no interest in the Hompes Tire Company account at this time, having accounts of much better volume in this market. Therefore, no major warehouse deal is open to him." The record shows that the tire companies referred to were three of the chief competitors of the Goodrich Company at the time. The Goodrich Company felt that it had not been getting its share of the tire business for some time. Naturally, the fact that none of three chief competitors were in a position to deal with the plaintiff and thereby gain an opportunity to secure the former dealers of Goodrich products as their own, was information of interest and value to the officers of the B. F. Goodrich Company. We fail to see how this statement could be construed as showing an intent to destroy or damage the business of the plaintiff.

Plaintiff also contends that on or about March 13, 1936, at the time the Goodrich Company was removing its products from the Hompes warehouse, a remark was made by Ed Lawrie, president of the State Tire Company, W. G. Sabine, or R. T. Eastman, representatives of the Goodrich Company, to the effect that Hompes would wish he had not acted as he had because when they got through he would have nothing left. The only person testifying to this statement is Alfred Goodwin, who was at the time employed by the State Tire Company of Lincoln. This statement appears

to us to be merely an expression of belief that Hompes had made a mistake in not remaining as a Goodrich dealer and warehouseman, and that he would go broke as a result of his action. We fail to find the expression of any ulterior motive in this statement that could be said to show an intent to destroy the business of the plaintiff within the purview of the Junkin Act.

Reliance is also placed upon a statement made to Dee Eiche by W. G. Sabine about the time of the establishment of the State Tire Company. Mr. Eiche said: "Well, he (Sabine) said they were going to go after the business and he said it might be a little tough for a while on the rest of the boys, but they were going to get their business in Lincoln, they hadn't been getting it to that time." This statement in no sense of the word indicates that anything other than fair competition was to be employed in its drive for business. The statement also had reference to all the competitors of the Goodrich Company, with no special reference to the plaintiff.

This fragmentary evidence of an intent to injure plaintiff, together with all the other evidence in the case, fails in our judgment to establish a violation of the Junkin Act. The alleged overt acts, together with the evidence of wrongful motives, fail to sustain a violation of the act as construed in *Marsh-Burke Co. v. Yost, supra,* and *State v. Interstate Power Co.,* 118 Neb. 756, 226 N. W. 427.

The law applicable may be stated as follows:

A combination or conspiracy between two or more persons against any person, firm or corporation to damage or destroy the business of such person, firm or corporation, which is carried into effect, is a violation of the Junkin Act (Comp. St. 1929, art. 8, ch. 59) and subjects such wrong-doers to an action for damages.

A conspiracy need not be established by direct evidence of the acts charged, but may, and generally must, be proved by a number of indefinite acts, conditions and circumstances, which vary according to the purposes to be accomplished. The evidence as a whole must show by a pre-

ponderance, however, the intent of the alleged wrong-doers to accomplish a result prohibited by the statute.

When the alleged overt acts are in themselves lawful, and the evidence does not tend to show an unlawful intent to conspire against and injure the business of another by stifling competition, the action must fail for want of proof.

A person may do business with whomsoever he desires. He may likewise refuse business relations with any person whomsoever, whether the refusal is based on reason, whim or prejudice.

One engaged in business has the right to meet competitive prices of merchandise of similar class, character or quality, and when he does so to meet competition, he does not violate the Junkin Act.

A volume bonus, which provides for a discount to a dealer in accordance with the amount of purchases he makes, is in itself entirely lawful unless an intent be shown to grant it as a means of injuring or destroying the business of another.

A written contract, if couched in clear, unambiguous language, is not subject to construction. The intent of the parties must be deduced from the language used in the contract.

We necessarily conclude, after a consideration of all the evidence and the application of controlling principles of law, that the evidence is insufficient to support a judgment.

In view of the conclusion reached, it will not be necessary for us to consider other alleged errors occurring during the trial. The judgment of the district court is reversed and the cause remanded for further proceedings in accordance with this opinion.

REVERSED.