## WITTE TRANSPORTATION COMPANY v. MURPHY MOTOR FREIGHT LINES, INC.

193 N. W. (2d) 148.

December 3, 1971—No. 42516.

*Joseph A. Maun, James W. Fahlgren, Maun, Hazel, Green, Hayes, Simon & Aretz, Clay R. Moore,* and *Mackall, Crounse, Moore, Helmey & Holmes,* for appellant.

*William S. Rosen, James S. Holmes,* and *Rosen, Ravich & Summers,* for respondent.

Heard before Knutson, C. J., and Nelson, Murphy, Peterson, and Kelly, JJ.

KELLY, JUSTICE.

Defendant, Murphy Motor Freight Lines, Inc., appeals from

a judgment for compensatory damages of $200 and exemplary damages of $6,000 in favor of plaintiff, Witte Transportation Company, entered after a trial before the court sitting without a jury.

The main issue in this case is: Does the evidence sustain the trial court's finding in substance that defendant intentionally, maliciously, and wrongfully interfered with the business relationship between plaintiff and its customers? All the other issues raised in this case are of no consequence if this finding is clearly erroneous. We think it is and reverse.

Plaintiff (Witte) and defendant (Murphy) are both motor common carriers licensed by the Public Service Commission to operate intrastate between Rochester, Minnesota, and the Twin Cities. They are, in fact, the only two motor carriers so licensed for the route between the Twin Cities and Rochester, and they have been competing with each other for a number of years for the freight shipped between those two points. Both Witte and Murphy also operate under other permits in competition with one another for business between other Minnesota cities. In the instant case, however, only the competition on the intrastate route between Rochester and the Twin Cities is of importance.

In competing for business, motor common carriers follow the practice of obtaining "routing letters" from freight consignees. The routing letter instructs a consignor shipper to route all future shipments via a particular motor carrier, and these requests are normally respected by the consignor. Obtaining these routing letters and maintaining a continuing relationship with customers who have already signed routing letters is an important and integral part of keeping and expanding a carrier's volume of business, and the carrier therefore maintains salesmen at the points of both origin and delivery to deal with both consignors and consignees of freight.

Several methods are used for preparing and transmitting a routing letter. In a few cases the consignee will, either on its own initiative or upon prompting by a salesman, prepare and trans-

mit a routing letter to the shipper or shippers from whom it receives freight. More commonly, the salesman will solicit the consignee's agreement to sign a routing letter, after which the salesman has the letter prepared, bringing it back to the consignee for signature. The letter is then transmitted by either the consignee or the salesman, the latter practice being more favorable to the carrier since the salesman is thereby assured of the delivery of the letter.

When a salesman gets a commitment from a consignee, he normally obtains blank letterhead stationery from the consignee for preparation of the letter. If the salesman fails to obtain the letterhead, or if the consignee does not have any, the salesman will normally have a "letterhead" typed on the letter.

These procedures for obtaining routing letters were used by Murphy during the period in question, August and September 1968. Murphy's salesman in Rochester at that time was Steven B. Molstad, who testified as a witness for Witte. (Witte attempted to call Molstad under the rules but agreed to have him sworn as its witness after it was noted that he was no longer employed by Murphy.)

Molstad stated that in August 1968 he had received several "leads" in Rochester which he was to contact for the purpose of obtaining routing letters. However, at that time he had been testifying before the Public Service Commission on other matters concerning Murphy, so he had fallen behind on his work. In order to facilitate following up the Rochester leads, he deviated from the standard policy of contacting the consignee before having the routing letter prepared. He requested that the Murphy St. Paul office prepare several routing letters, which he intended to take with him when he contacted the Rochester leads. Carolyn Nowicki, an employee of Murphy, prepared an original and four copies of each letter, sending the original and two copies of each to Molstad and retaining the two additional copies at the St. Paul office. Since Molstad had not sent letter-

head paper, Miss Nowicki typed a "letterhead" on each of the letters.

Armed with the prepared letters, Molstad then contacted the consignees in Rochester, but in the six cases involved in this action the consignees indicated no interest in changing carriers.[1] Molstad testified he never even showed the letters to the persons he contacted; instead, he merely tore up the letters and copies, thinking that the matter was at an end.

However, of the two copies of each letter remaining in the St. Paul office, one was placed in the Murphy office file and the other was distributed to the Twin Cities salesman in whose area the particular shipper was located. In this case the copies were distributed to Eugene K. Wobbrock and Robert J. Ethen. Both Wobbrock and Ethen testified that they regularly received copies of routing letters in their mailboxes; this indicated to them that a contact had been made at the other end and that the shipper

---

[1] The six letters in issue were those which purported to be sent by: Beauty Floor of Rochester to Neidhoefer and Company, Minneapolis; Firestone Tire Company, Rochester, to Firestone Tire and Rubber Company, Minneapolis; Palmer-Soderberg, Inc., Rochester, to Fred T. Lowy Ceramics, Minneapolis; Glen Tile Company, Rochester, to Fred T. Lowy Ceramics, Minneapolis; National Bushing, Rochester, to Automotive Northern Warehouse, St. Paul and National Bushing, Rochester, to Barry & Sewall Industrial Supply, Minneapolis.

Five of the letters were worded exactly the same except for the "letterhead," inside address, and signature. They read:

"Attn: Shipping Dept

"Gentlemen

"Service is playing an ever more important part in business today. In the past we have had a fine relationship with Murphy Motor Freight Lines.

"I would be very grateful if you would route all future shipments via Murphy into Rochester.

"I thank you in advance for your consideration, and would appreciate your acknowledgement of this request. Thank you.

"Sincerely"

One of the letters to Fred T. Lowy Ceramics was worded slightly differently but expressed substantially the same directive.

would receive a signed routing letter from the consignee within a short time. There was also testimony that, after receiving a copy of the letter, the salesman would normally allow time for the shipper to receive the original and would then contact the person in charge of shipping for the designated consignor, giving him the copy and instructing him to watch for the signed original which had either already arrived or would soon arrive. Both Wobbrock and Ethen testified that they normally followed this procedure, although neither specifically remembers what they had told the shippers' personnel when delivering these particular copies. Both testified that they did not try to pass the copies off as originals, and the plaintiff presented no evidence that they did so.

This court has long recognized that there lies an action for the wrongful interference with noncontractual as well as contractual business relationships. Tuttle v. Buck, 107 Minn. 145, 119 N. W. 946 (1909). Other courts that have considered this question have likewise held, almost universally, that the tort of interference with contractual rights should be extended to include noncontractual business relationships. Annotation, 9 A. L. R. 2d 228, 255. Prosser, Torts (4 ed.) § 130.

Defendant argues that, even if there was an interference with the business relationship of the plaintiff and its customers, there was not sufficient malice or intent to bring the present case within the scope of tortious interference with a business relationship. Although it is true that the basis of liability in Tuttle v. Buck, *supra,* was predicated upon an intentional, malicious attack upon the business of another, in subsequent cases we have explained that malicious intent of the kind found in Tuttle is not a prerequisite to a finding of liability. The scope of the tort encompasses a broader legal area than the narrow limits of the facts in Tuttle. For example, we later held that an action could be based on "the intentional doing of a wrongful act without legal justification or excuse, or otherwise stated the wilful violation of a known right * * *, malice in the sense of ill-will or spite not being es-

sential." Carnes v. St. Paul Union Stockyards Co. 164 Minn. 457, 462, 205 N. W. 630, 631 (1925). See, also, Joyce v. G. N. Ry. Co. 100 Minn. 225, 110 N. W. 975 (1907).

However, we have never allowed a recovery for negligent wrongful interference with a business relationship. The wrongful act of interference must have been intentionally done. The courts generally have not recognized a negligent wrongful interference with a business relationship as an actionable tort. Cf. Prosser, Torts (4 ed.) § 130, p. 952.

In the present case the trial court found, inter alia:

"The preparation and delivery of said false letters was done wantonly, willfully, and intentionally, and for the purpose of wrongfully diverting freight traffic from the Plaintiff to the Defendant. As a result of Defendant's actions the Plaintiff suffered actual loss of revenues in the sum of $200.00."

A careful reading of the transcript reveals no evidence that Molstad had the letters prepared wantonly, willfully, and intentionally for the purpose of wrongfully diverting freight. The letters themselves contained a self-made trap. The last paragraph of the five identical letters stated: "I thank you in advance for your consideration, and would appreciate your acknowledgement of this request." Had Molstad prepared the letters intending that Murphy's salesmen would use the copies—by reading them to or leaving them with the consignors—he would not have included a request for an acknowledgement. Both Wobbrock and Ethen testified that they left the copies of the letters with the appropriate consignors. If there had been knowledge on their part that the originals had not been executed by the consignees, we think it unlikely that they would have left the copies which requested an acknowledgement.

Murphy is a large intra- and interstate carrier; it carries freight to many points both within and without the state. It was testified that all the shippers who received these routing letters did on a number of occasions ship goods via Murphy to destina-

tions other than Rochester. An attempt to gain business for a single route by false letters, when discovered, could only be detrimental to its interest in freight going to other points. The amount to be gained by such an intentional fraud would be minimal compared to losses that could be sustained.

The key testimony in this case was given by Molstad. His testimony showed that he departed from the established custom of calling on consignees first to obtain their consent to prepare the letters for their signatures. More importantly, he testified that he assumed that the matter was at an end when he tore up the originals and the copies in his possession. The testimony of Wobbrock and Ethen, that they did not know that the originals had not been signed, negates knowledge on their part which would be essential to establish an intent to misrepresent.

The evidence in this case all points to an administrative failure whereby the copies of the letters in question were given to the Twin City consignors by Wobbrock and Ethen. There being no evidence that Molstad intentionally had the letters prepared for the purpose of wrongfully diverting freight from the plaintiff and there being no evidence that Wobbrock and Ethen used the copies of the letters with knowledge that the originals had not been signed, there is at best a negligent wrongful interference with a business relationship, which is not an actionable wrong. Thus, we conclude that the trial court's finding is not substantiated by the evidence and is clearly erroneous.[2]

Our holding that there was no actionable wrong because there was no intentional wrongful act precludes recovery for either compensatory damages or punitive damages.

Reversed.

---

[2] Rule 52.01, Rules of Civil Procedure.