DIESEL SERVICE, INC., A NEBRASKA CORPORATION,
APPELLANT, V. ACCESSORY SALES, INC., APPELLEE.

288 N. W. 2d 258

Filed January 29, 1980.   No. 42372.

Wright & Simmons and John A. Selzer, for appellant.

Donald J. Tedesco, for appellee.

Heard before KRIVOSHA, C. J., BOSLAUGH, McCOWN, CLINTON, BRODKEY, WHITE, and HASTINGS, JJ.

BOSLAUGH, J.

This was an action for damages brought by the plaintiff, Diesel Service, Inc., against the defendant, Accessory Sales, Inc.  The action arose out of a controversy concerning a distributorship agreement between the parties in which the plaintiff was granted an exclusive territory for the distribution of the R-W precleaner, an air filter or cleaner device used on

diesel engines.

The agreement, which was entered into on November 16, 1966, provided that the plaintiff would pay promptly for all equipment purchased from the defendant in accordance with the terms of the agreement. The agreement further provided that in the event either party breached the agreement, and the breach continued unremedied for 60 days after notice of the breach by the party not in default, the party not in default, at its option, might terminate the agreement by written notice to be effective 10 days after service. The agreement provided specifically that time of payment and performance was of the essence of the agreement.

The terms of payment specified in the agreement were as follows: "Cash discount 2 per cent 10th and 25th, net 30; which means a cash discount of 2 per cent as to all items received between the 25th of the month and the 10th of the following month, and paid by the 10th of such following months, and such a discount of 2 per cent of all items received between the 10th and 25th of each month if paid by the 25th of that month with net price being due in 30 days."

The evidence shows that the plaintiff developed a large market for the defendant's product in the territory granted to the plaintiff, but as the volume of business increased the plaintiff did not keep its account with the defendant current. On December 5, 1973, the defendant sent a 60-day notice of default to the plaintiff. A notice of termination was not sent following this notice, and in its answer the defendant admitted the plaintiff remedied the breach by payment of "an amount sufficient to bring its account current."

On January 27, 1975, the defendant again sent a 60-day notice of default to the plaintiff and a 10-day termination notice on March 28, 1975. The principal issue in the case is whether in fact the plaintiff was in default on March 28, 1975, so that the defendant

could terminate the agreement.

The parties continued to do business with each other after April 7, 1975, and the defendant continued to fill orders from the plaintiff until April 21, 1975.

On April 21, 1975, at about 7:30 a.m., Len Cranston, the only salesman employed by the plaintiff, came to the plaintiff's office and notified Daniel E. Kinnison, the president and sole stockholder of the plaintiff, that he was quitting. Cranston then immediately went to the defendant's office and spent the day telephoning customers of the plaintiff to tell them the plaintiff was no longer a distributor for the defendant's product, that dealers could now buy directly from the defendant, and Cranston was now employed by the defendant. On the same day the defendant mailed 500 letters to the plaintiff's customers telling them the plaintiff was no longer a distributor of the defendant's product and the product could now be purchased directly from the defendant. Before Cranston told Kinnison that he was quitting, he had the secretaries employed by the defendant copy the information in the customer books Cranston had used when he was on the road for the plaintiff.

On the same day, April 21, 1975, after Cranston had notified Kinnison that he was quitting, Thomas Wilson, the president of the defendant, came to the plaintiff's office and told Kinnison the contract was terminated. The last sale and delivery of the product from the defendant to the plaintiff took place that day.

When Cranston went on the road for the defendant, he picked up the plaintiff's catalogs, destroyed them, and substituted the defendant's catalogs for the plaintiff's when he called on customers.

This action was commenced on December 22, 1977. The plaintiff alleged that Thomas Wilson and the defendant conspired with Cranston to injure the business of the plaintiff and acquire its customers; that

the defendant owed the plaintiff $16,832.21 for volume discounts; that the defendant wrongfully breached the distributorship agreement; that the agreement had not been lawfully terminated; that the plaintiff had been damaged in the amount of $818.75 because the defendant had converted the plaintiff's catalogs; and that the plaintiff had been damaged by loss of business because of the conversion of its catalogs. The petition prayed for $16,832.21 for volume discounts, $818.75 for the converted catalogs, and general damages with interest, costs, and an attorney's fee.

The defendant's answer alleged that the terms of each order were specified on the invoice; that the plaintiff breached the distributorship agreement by failing to keep its account current; that the agreement for volume discounts had been terminated because of the plaintiff's delinquencies; that the agreement had been terminated by the March 28, 1975, notice of termination; that there had been an accord and satisfaction between the parties; and that the defendant had not converted the plaintiff's catalogs. The defendant also counterclaimed for alleged unfair competition by the plaintiff after the agreement had been terminated.

The case was submitted to the jury by a form of special verdict which contained eight questions. By its verdict the jury found the defendant had not conspired with Cranston to injure the plaintiff's business; the plaintiff had breached the agreement by failing to pay promptly and did not correct the default within 60 days after notice; the defendant had not waived the breach of the agreement by the plaintiff; there had been no accord and satisfaction; the defendant had converted the plaintiff's catalogs and the plaintiff had been damaged in the amount of $3,000 because of the conversion of its catalogs; and the plaintiff had not been damaged because of the defendant's "bad faith" or "without cause" termina-

tion of the contract.

The trial court entered judgment for the plaintiff on the verdict. Later, on the defendant's motion to set aside the judgment or verdict, the trial court granted a remittitur for that portion of the verdict in excess of $800. The plaintiff then filed its notice of appeal.

The facts concerning the products purchased by the plaintiff from the defendant and the payments by the plaintiff to the defendant are not in dispute. The evidence shows the defendant kept its books by debiting the plaintiff's account with purchases, crediting the account with payments "On acct," and showing the balance due after each entry. Thus, the plaintiff's account was treated as an open or "running" account by the defendant. The defendant made no attempt to account for each invoice separately and did not treat each invoice as a separate account. The defendant's method of accounting applied the plaintiff's payments to the earliest purchases and was fully in accord with the terms of the contract.

Under the terms of the distributorship agreement, the plaintiff was required to pay for products purchased within 30 days of the purchase. The evidence shows the plaintiff was in default on January 27, 1975, because on that date it owed the defendant an amount greater than the amount due for products purchased within the preceding 30 days. However, during the next 60 days the plaintiff made sufficient payments to the defendant so that at the end of the 60-day period the amount due the defendant was less than the amount due for products purchased within the preceding 30 days. Thus, the evidence shows as a matter of law that the plaintiff was not in default on March 28, 1975, and the defendant had no right to terminate the contract.

This is in accord with the general rule as to application of payments between debtors and creditors.

In State v. Hill, 47 Neb. 456, 66 N. W. 541, this court said: "The rule deducible from the authorities in regard to the application of payments may be summarized as follows: A debtor paying money has the right to direct its application, but if he fails to do so, the creditor may make the application at any time before suit is brought. (Robinson v. Doolittle, 12 Vt., 246; Wendt v. Ross, 33 Cal., 650; McCune v. Belt, 45 Mo., 174; United States v. Kirkpatrick, 9 Wheat. [U. S.], 720.) It is equally well settled that where payments are made on an open account, and no appropriation thereof has been made by either party before a controversy has arisen concerning them, the law will apply them in discharge of the earliest items. (Lazarus v. Friedheim, 11 S. W. Rep. [Ark.], 518; Pierce v. Knight, 31 Vt., 701; Milliken v. Tufts, 31 Me., 497; Wendt v. Ross, 33 Cal., 650; Thurlow v. Gilmore, 40 Me., 378; Harrison v. Johnston, 27 Ala., 445; Hersey v. Bennett, 9 N. W. Rep. [Minn.], 590; United States v. Kirkpatrick, 9 Wheat. [U. S.], 720; Jones v. United States, 7 How. [U. S.], 684.) In the last case the rule was applied to a running account between the United States and a postmaster. In United States v. Kirkpatrick, *supra,* Judge Story in delivering the opinion of the court said: 'The general doctrine is that the debtor has a right, if he pleases, to make the appropriation of payments; if he omits it, the creditor may make it; if both omit it, the law will apply the payments *according to its own notions of justice.* It is certainly too late for either party to claim a right to make an appropriation, after the controversy has arisen, and a fortiori at the time of the trial. In cases like the present, of long and *running accounts,* where debits and credits are perpetually occurring, and no balances are otherwise adjudged than for the mere purpose of making rests, we are of opinion that payments ought to be applied to extinguish the debts according to the priority of time; so that the credits

are to be deemed payments pro tanto of the debts antecedently due.' " See, also, State ex rel. Spillman v. Security State Bank, 116 Neb. 526, 218 N. W. 407.

The defendant produced an expert witness who testified that the plaintiff was in default on March 28, 1975. He arrived at this conclusion by reconstructing the defendant's books and applying particular payments to particular invoices. By this method it was possible to identify certain invoices as being unpaid for more than 30 days. This witness admitted, however, that the plaintiff was not in default if all purchases were debited to the account and all payments credited as in fact the account had been kept.

There was nothing in the agreement that required the plaintiff to pay each invoice separately, and the defendant's method of bookkeeping demonstrated that it did not so interpret the agreement. The plaintiff's obligation under the agreement was to pay for products purchased within 30 days. On March 28, 1975, the plaintiff had remedied the default because its indebtedness to the defendant was less than the amount due for products purchased within the preceding 30 days.

After the dispute had arisen, the defendant had no right to change its application or appropriation of the payments which the plaintiff had made to its account.

By instruction No. 4 the trial court advised the jury that the plaintiff was required to pay "each invoice" within 30 days and the plaintiff was in default if it "owed defendant on an invoice 30 full days or more past its shipping date." The instruction was erroneous because it interpreted the contract to mean that each invoice was to be treated separately. More importantly, since there was no issue for the jury in that regard, the jury should have been instructed that the plaintiff was not in default on

March 28, 1975, and the defendant's wrongful attempt to terminate the contract was a breach of the contract.

It is unnecessary to discuss the plaintiff's other assignments of error except that a remittitur was improper under the facts and circumstances in this case. The verdict of $3,000 for the destruction or conversion of the plaintiff's catalogs indicated that it was probable the jury did not understand the manner of the submission of the case and the verdict was a result of error or mistake.

Since the evidence does not support the verdict the judgment must be reversed and the cause remanded for a new trial. The judgment of the District Court is reversed and the cause remanded for a new trial.

REVERSED AND REMANDED FOR A NEW TRIAL.

CLINTON, J., dissenting.

I respectfully dissent from the majority opinion because I believe it misuses, in a manner which is without precedent, the principles of law pertaining to application of payments, and it does so in such a way as to change and modify the plain and unambiguous terms of the written contract between the parties.

The majority opinion, in its second and third paragraphs, summarizes the contractual provisions relative to payment and the right to terminate for unremedied delay in payment.

The trial court instructed the jury as follows: "The Court has determined, as a matter of law, and you must accept it as such, that the contract required plaintiff to 'pay promptly'; that 'pay promptly', in this case, means pay each invoice no later than 30 full days from shipping date; that if plaintiff, on January 27, 1975, owed defendant on an invoice 30 full days or more past its shipping date and if plaintiff, on the 61st day following its receipt of the demand letter of January 27, 1975, owed defendant on an invoice 30 full days or more past its shipping date,

even though it not be an invoice owed on January 27, 1975, plaintiff is deemed to have breached the contract and defendant was entitled to terminate the contract unless (a) Its right to so terminate had been waived, or, (b) Its exercise of its right to terminate was in bad faith in furtherance of or pursuant to a conspiracy as alleged by the plaintiff." That instruction correctly interprets the contractual provision and the majority does not contend otherwise. Rather, the majority in effect says that the manner in which the defendant kept its books changed the terms of the contract.

The issues of whether the right to terminate had been waived and whether the termination was in bad faith and in furtherance of a conspiracy were submitted to the jury and on these factual issues the jury found for the defendant, Accessory Sales, Inc. Likewise, there was submitted to the jury the factual determination of whether the plaintiff had failed to pay promptly and in accordance with the terms of the contract as interpreted by the court and that factual issue was resolved in favor of the defendant.

The contract clearly provided that each invoice was to be paid within 30 days of date. It also provided that if default was not remedied within 60 days, then the party not in default could give notice of termination. Termination was effective 10 days after notice.

The plaintiff so understood the contract. The testimony of the plaintiff's owner was as follows: "Q. So you understood that you were to pay 30 days after the date of the invoice? A. Yes. Q. And the contract so provides? A. The contract provides, that was the way we understood it."

The record clearly establishes that the plaintiff was delinquent in its payments during most of the period of the dealings of the parties and that the amounts were substantial. It supports the conclusion that the defendant determined it could no longer

continue in effect to finance the plaintiff's operations by prolonged extensions of credit beyond contract terms. This factual issue, as we noted, was decided by the jury in favor of the defendant. It found that there was no waiver and there was no bad faith in termination.

The record shows that the defendant kept only one ledger for the plaintiff's account. On that record, each sale to the plaintiff was separately listed by date, invoice, and the charges for each invoice. The record indicates that when the plaintiff paid, it seldom paid by single invoice but paid them in groups, for example, three invoices at a time. When the defendant entered the payment on the ledger, it recorded the date and amount of the total payment but did not identify the invoices paid. The ledger showed a running balance of the total owed.

It was possible, however, to relate the payments to the invoices by adding invoices and comparing the amounts of the payments. This the accountant did in preparing the exhibits supporting his testimony. The plaintiff in no way relied upon, nor was it prejudiced by, the way in which the defendant recorded the payments. It acknowledged that it was in default more than it was current.

The instruction left to the jury the determination of whether there was a default within the meaning of the contract as the court had interpreted it. The instruction merely states what the unambiguous terms of the contract were. The interpretation of an unambiguous contract is for the court as a matter of law. Smith v. Wrehe, 199 Neb. 753, 261 N. W. 2d 620; Grantham v. General Tel. Co., 191 Neb. 21, 213 N. W. 2d 439.

Neither the plaintiff nor the majority opinion cites any authority for the use it makes of the application of the payment doctrine in this case. The sole authority cited by the court is State v. Hill, 47 Neb. 456, 66 N. W. 541. That case involved several differ-

ent debts and the rights of third parties, and there was no agreement of the contracting parties as to application. In this case, the contract specifically provided that payments were to be made by invoice within 30 days. Payments were, in fact, made by invoice. The failure of the defendant in this case to record invoice numbers at the time payments were made did not change the fact. In any event, the factual determination was left to the jury and it decided adversely to the plaintiff. The plaintiff did not suffer by the way the defendant made the records. The plaintiff had its own records and knew what it had paid and how it was delinquent.

The rule applying payments to the oldest items has no application when the parties have contracted otherwise. The court must, in that case, apply payments in accordance with the intentions of the parties. 70 C. J. S., Payment, § 72 b, nn. 87, 88, p. 277.

In Ford Hardwood Lbr. Co. v. Bryant, 178 Ark. 807, 13 S. W. 2d 1, the court said: "The doctrine as to the application of payments is stated by this court as follows: 'The general rule is that, where neither debtor nor creditor makes an appropriation at the time of payment, the law applies it to the liabilities of earliest date. The reason is because that course is presumed to conform to the intention of the creditor. Kline v. Ragland, 47 Ark. 119, 14 S. W. 474. If there is any particular reason for a different appropriation, the rule does not apply. Thus, where cotton covered by a mortgage is delivered to the mortgagee, with authority to sell and retain the proceeds, the law appropriates the payment to the discharge of the mortgage debt, because the parties have impliedly agreed in advance how the proceeds shall be disposed of. * * * Whenever the relation of the parties or the nature of the account or transaction between them shows that an appropriation of payments to the earliest items of the account would do injustice between them or fail to conform to their

understanding or agreement, another application is made.' Faisst v. Waldo, 57 Ark. 270, 21 S. W. 436.'' The first in, first out rule has no application where it would produce inequitable results. Lowden v. Northwestern Nat. Bank & Trust Co., 84 F. 2d 847.

In this case, inequitable results come about because the defendant is deprived of the benefit of its contractual provisions and no equity on the plaintiff's behalf requires a different application than that provided for by the contract. The record shows that the defendant extended credit to the plaintiff for a considerable period of time in a more generous fashion than the contract provided. This gives the plaintiff no equities. This is not a case of an ordinary open account where there was no antecedent agreement as to how payment was to be made.

I would affirm.