DIESEL SERVICE, INC., A NEBRASKA CORPORATION,
APPELLEE, V.
ACCESSORY SALES, INC., APPELLANT.

317 N.W.2d 719

Filed March 12, 1982.   No. 44237.

Donald J. Tedesco for appellant.

Wright & Simmons for appellee.

Heard before KRIVOSHA, C.J., BOSLAUGH, McCOWN, CLINTON, BRODKEY, WHITE, and HASTINGS, JJ.

BOSLAUGH, J.

This is a second appeal in this case which arose out of a controversy concerning the termination of a distributorship agreement between the parties. The distributorship agreement granted the plaintiff an exclusive territory for the distribution of the R-W precleaner, an air filter or cleaner device manufactured by the defendant and used on diesel engines. During the time that the plaintiff was a distributor for the defendant, it developed a large market for the R-W precleaner.

The amended petition alleged the defendant and Thomas W. Wilson, the president of the defendant, conspired with Lenvil P. Cranston, a salesman employed by the plaintiff, to injure the plaintiff's business, restrain trade, create a monopoly, and acquire the plaintiff's business by unfair business practices and terminate the distributorship agreement.

At the first trial the case was submitted to the jury by a form of special verdict which contained eight questions. The jury found the defendant had not conspired with Cranston to injure the plaintiff's business; the plaintiff had breached the agreement by failing to pay promptly and did not correct the default within 60 days after notice; the defendant had not waived the breach of the agreement by the plaintiff; there had been no accord and satisfaction; the defendant had converted the plaintiff's catalogs and the plaintiff had been damaged in the amount of $3,000 because of the conversion of its catalogs; and the plaintiff had not been damaged because of the defendant's "bad faith" or "without cause" termination of the contract.

The trial court entered judgment for the plaintiff on

the verdict. Later, on the defendant's motion to set aside the judgment or verdict, the trial court granted a remittitur for that portion of the verdict in excess of $800.

The trial court had instructed the jury that the plaintiff was required to pay the defendant for each invoice within 30 days and that the plaintiff was in default under the agreement if it owed the defendant on an invoice 30 full days or more past its shipping date. We held this instruction was erroneous and that the evidence did not show the plaintiff was in default. We concluded that a remittitur was improper under the facts and circumstances of the case because it was probable the jury did not understand the manner of the submission of the case and the verdict was the result of error or mistake. *Diesel Service, Inc. v. Accessory Sales, Inc.*, 205 Neb. 381, 288 N.W.2d 258 (1980).

The judgment was reversed and the cause remanded for a new trial. This was a general remand and contemplated a new trial on all of the issues.

At the second trial the defendant introduced additional evidence relating to the plaintiff's indebtedness to the defendant under the agreement. This evidence tended to establish that the plaintiff was in default under the agreement on March 28, 1975, but had eliminated the default by April 21, 1975, the day on which Thomas Wilson, the president of the defendant, came to the plaintiff's office and told Daniel E. Kinnison, the president of the plaintiff, that the contract was terminated.

The trial court, however, withdrew from the jury any issue concerning whether the plaintiff was in default under the agreement on March 28, 1975. The jury was instructed specifically that the plaintiff was not in default on March 28, 1975, and that the defendant had no right to attempt to terminate the contract because of the alleged default.

The case was again submitted to the jury upon

special interrogatories. The jury returned the following verdict:

"1. Did the parties effect an 'accord and satisfaction' concluding and settling all duties and obligations owed by each to the other under their contract?

Answer _____ or __✓__
        Yes    No

"2. Did defendant Accessory Sales, Inc., conspire with Lenvil Cranston for any of the purposes alleged by plaintiff Diesel Services, Inc. as set forth in Instruction No. 2?

Answer __✓__ or _____
        Yes    No

"3. Amount of damages, if any, incurred by plaintiff because of defendant's conspiracy with Lenvil Cranston for the purposes alleged by plaintiff Diesel Service, Inc.

Answer _____ $250,000.00 _____

"4. Had the parties' contract been in existence for a reasonable period of time, within the meaning of Instructions No. 16 & 23, when defendant Accessory Sales, Inc. attempted to terminate it?

Answer _____ or _____
        Yes    No

"5. Did plaintiff Diesel Services, Inc. ever receive reasonable notice of defendant's intention to terminate the contract, within the meaning of Instructions No. 16 & 23?

Answer _____ or _____
        Yes    No

"6. Amount of damages, if any, incurred by plaintiff because of (a) the parties' contract not being in existence for a reasonable period of time prior to defendant's attempted termination: or (b) because of termination: or both (a) and (b)

Answer $ _____ "

Since the jury found that the defendant had conspired with Lenvil Cranston, the plaintiff's former salesman, to injure the plaintiff's business and acquire

its business by unfair business practices, the jury did not answer the last three interrogatories. The trial court entered judgment on the verdict and awarded the plaintiff attorney fees in the amount of $37,650 and costs in the amount of $2,117. The defendant has appealed.

The verdict of a jury will not be set aside on appeal unless it is clearly wrong. *Sortino v. Paynter*, 206 Neb. 348, 292 N.W.2d 916 (1980). In determining whether the evidence is sufficient to sustain a jury verdict, the evidence must be considered most favorably to the successful party, every controverted fact must be resolved in his favor, and he is entitled to the benefit of any inferences reasonably deducible from it. *Lockhart v. Continental Cheese, Inc.*, 203 Neb. 331, 278 N.W.2d 604 (1979).

The evidence at the second trial was such that the jury could find the following facts to be true.

E. W. Wilson was the original president of the defendant Accessory. During the course of the business relationship with the plaintiff, E. W. Wilson retired and his son Thomas Wilson became president of the defendant. Prior to his father's retirement, Thomas Wilson became friendly with Cranston, the plaintiff's salesman, and eventually told other employees of the defendant that as soon as E. W. retired, he would "get rid of" the plaintiff, take over its customers, and sell the precleaner direct. Thomas Wilson also told the employees that Cranston would come to work for the defendant.

In 1973, prior to E. W.'s retirement, Thomas Wilson sent the plaintiff a notice of default stating that the distributorship agreement between the two companies would be canceled if the plaintiff did not bring its account current. The plaintiff at that time brought its account substantially current, and the contractual relationship continued.

On January 27, 1975, Thomas Wilson again sent the plaintiff a "60-day termination notice." The contract

provided that "should [a] breach continue unremedied for a period of 60 days after written notice by the party not in default . . . then the party not in default . . . may give written notice of termination for the agreement which shall become effective 10 days after the service thereof . . . ." Sixty days later, on March 28, 1975, Thomas Wilson sent the plaintiff a letter terminating the distributorship agreement because the account ostensibly had not been brought current by the plaintiff.

The defendant continued to fill orders from the plaintiff until April 21, 1975. On that day Thomas Wilson came to the plaintiff's office and told the plaintiff's president that the contract was terminated. The last sale and delivery from Accessory to Diesel took place on that date. At the time of the termination, Diesel was the only distributor of the defendant which had a contract. The plaintiff was not the only distributor behind in its payments, but it was the only one terminated.

On April 21, 1975, Cranston notified the plaintiff at 7:30 a.m. that he was quitting the plaintiff's employ. On the same day, Cranston went to work for the defendant and spent the entire day on the telephone calling the plaintiff's customers and advising them the R-W precleaner could now be purchased directly from the defendant. Shortly thereafter, Cranston called upon the same customers personally and advised them that Diesel was no longer the precleaner distributor and that they could order direct from the defendant. At this time Cranston, under Thomas Wilson's direction, picked up and destroyed the catalogs of the plaintiff which contained not only the precleaner but other products sold by the plaintiff as well. It also appears that, even before he left the plaintiff's employ, Cranston brought to the office of the defendant the books of the plaintiff's customers that he carried with him and, with Thomas Wilson's knowledge, had the secretaries at the defendant's office copy the information from the plaintiff's customer books, telling the

secretaries that the copying had to be done before he left the plaintiff. Also, before Cranston quit the plaintiff, 500 letters were prepared by the defendant's office stating that the plaintiff was no longer the distributor for the R-W precleaners and that they could now be purchased from the defendant directly. These letters were mailed to the plaintiff's customers on April 21, 1975, the same day that Cranston went to work for the defendant.

This court has recently confirmed that there is an action in Nebraska for injury to one's business. *Dixon v. Reconciliation, Inc.*, 206 Neb. 45, 291 N.W.2d 230 (1980). Numerous other jurisdictions have recognized a like cause of action. See, e.g., *Clark v. Figge*, 181 N.W.2d 211 (Iowa 1970); *Witte Transp. Co. v. Murphy Motor Freight Lines, Inc.*, 291 Minn. 461, 193 N.W.2d 148 (1971); *American Sanitary Service v. Walker*, 276 Or. 389, 554 P.2d 1010 (1976); *Buono Sales, Inc. v. Chrysler Motors Corporation*, 363 F.2d 43 (3d Cir. 1966), *cert. denied* 385 U.S. 971, 87 S. Ct. 510, 17 L. Ed. 2d 435.

A conspiracy to accomplish a lawful object by unlawful or oppressive means may be actionable. *Treptow Co. v. Duncan Aviation, Inc.*, *ante* p. 72, 313 N.W.2d 224 (1981). Where two or more persons combine to unlawfully injure another's business, the action is properly one for conspiracy.

"'An action of conspiracy sounds essentially in tort. . . . The principle [sic] element of conspiracy is an agreement or understanding between two or more persons to inflict a wrong against or injury upon another. It involves some mutual mental action coupled with an intent to commit the act which results in injury. Without the scienter persons cannot conspire.'" *Dixon v. Reconciliation, Inc.*, *supra* at 47, 291 N.W.2d at 232. As this court noted in *Rettinger v. Pierpont*, 145 Neb. 161, 195, 15 N.W.2d 393, 411 (1944), "'To constitute a conspiracy there must be a combination of two or more persons; * * * a precon-

ceived plan and unity of design and purpose, for the common design is of the essence of the conspiracy.'" *Davidson v. Simmons*, 203 Neb. 804, 808-09, 280 N.W.2d 645, 648-49 (1979), points out: "If it be proved that defendants, by their acts, pursued the same object, although by different means, one performing one part and another another part, with a view to the attainment of the same object, the conclusion is justified that they were engaged in a conspiracy to effect that object."

The Nebraska case most closely in point is *Frank H. Gibson, Inc. v. Omaha Coffee Co., on rehearing* 179 Neb. 169, 137 N.W.2d 701 (1965). In *Gibson*, the defendant, a coffee wholesaler, wished to buy the retail coffee supply business of the plaintiff. The evidence showed that the defendant's president and one of the plaintiff's salesmen (who was also a director and stockholder in the plaintiff) worked out an arrangement whereby, if the plaintiff's president would not agree to sell on the defendant's terms, the defendant's president and all of the plaintiff's salesmen would simply form a new company and take over the plaintiff's equipment and customers. The defendant's president, Clark, told the plaintiff's president, Bellows, "'"Well, if we can't work something out" * * * "we are prepared to go into business ourselves, set up our own company. Your boys, men, have agreed to go with us, and we will start this company and start delivery of coffee to your customers next Monday morning.'" *Id.* at 174, 137 N.W.2d at 705. The *Gibson* opinion states: "After he [Bellows] learned that Clark and Loseke [plaintiff's salesman and a director of plaintiff] had agreed to form another company and to take over the business with the Gibson sales force, he determined he had to sell to the highest bidder. There was no way to replace his salesmen on quick notice. The last coffee order to Conroy company had not been delivered and he would be out of business without a sales force, so he was forced to sell as best he could. He secured the authorization of the

stockholders to sell and sold the physical assets of Gibson to Continental Coffee Company . . . at their book value. No good will was sold, although this fact is disputed by defendants." *Id.* at 176, 137 N.W.2d at 706.

In the first opinion in the *Gibson* case, 178 Neb. 329, 133 N.W.2d 462 (1965), we reversed the judgment for the plaintiff, citing *Hompes v. Goodrich Co.*, 137 Neb. 84, 93, 288 N.W. 367, 372 (1939), in which it was stated: "We fail to see where the cancelation of the contracts in accordance with their very terms can operate to create a liability against the defendants, either by contract or under the Junkin Act." However, in the *Hompes* opinion it was also stated: "While each of the acts of defendants were in themselves lawful, such lawful acts accompanied by an ulterior motive might be actionable. We must, therefore, look into the evidence bearing upon the question of intent." *Id.* at 94, 288 N.W. at 372. In *Hompes* we simply found there was no evidence of an unlawful motive on the part of the defendants.

On rehearing in the *Gibson* case, the first opinion was vacated and the evidence was held to be sufficient to sustain the jury's finding of conspiracy. *Frank H. Gibson, Inc. v. Omaha Coffee Co., supra.*

In the second opinion we stated: "[Here w]e do not have a refusal to do business, but rather an attempt to steal a business by taking unfair advantage of a business relationship. Here we have Clark working with Loseke, a fiduciary, to force a sale to Conroy on its own terms or to destroy the good will of Gibson. Proof of the intent, understanding, or agreement in such instances must usually rest largely on inferences. Here, however, we have direct testimony on the intent of Conroy, corroborated essentially by legitimate inferences from Loseke's actions. Also, the preliminary preparation and the promptness with which the defendants took over the Gibson routes can substantiate the inference of a preconceived plan." 179 Neb. at 180, 137 N.W.2d at 708.

The facts in the present case show that it is very similar to the *Gibson* case. Here there was direct evidence that Thomas Wilson intended to "get rid of" the plaintiff as a distributor, take over its customers, and sell the R-W precleaner directly. Cranston, the plaintiff's salesman, had the defendant's employees copy the books of plaintiff's customers and prepare a mass mailing to those customers with reference to the changeover, all while Cranston was still employed by the plaintiff. After quitting the plaintiff and joining the defendant's firm, Cranston called on the plaintiff's former precleaner customers and destroyed the plaintiff's catalogs.

On April 21, 1975, everything was in readiness for the takeover of the plaintiff's customers, through the efforts of Cranston and Thomas Wilson. Compare this citation from *Gibson*, substituting the names pertinent to the present case: "Here . . . we have direct testimony on the intent of [Wilson], corroborated essentially by legitimate inferences from [Cranston's] actions. Also, the preliminary preparation and the promptness with which the defendant took over the [plaintiff's customers] can substantiate the inference of a preconceived plan."

In *Gibson* the opinion points out the fact that even if the end goal is legitimate, that does not prevent a finding of conspiracy. "A legitimate purpose does not justify an unlawful act. . . . It is the preconceived plan to accomplish this purpose which is illegal . . . ." *Frank H. Gibson, Inc. v. Omaha Coffee Co., on rehearing* 179 Neb. 169, 181, 137 N.W.2d 701, 709 (1965). *Gibson* points out that leaving the plaintiff's employ to work for another company was not an illegal act. "There is no question that any of the plaintiff's employees, including Loseke, could leave plaintiff's employ at any time and take employment with anyone else, and it is not their leaving the employ that is actionable. It is the agreement before any sale that unless a sale was made to Conroy they would take over the Gibson business." *Id.*

at 182, 137 N.W.2d at 709.

We conclude that the evidence in this case was sufficient to sustain the finding of a conspiracy.

Because the jury found there was a conspiracy, any issue as to the defendant's right to terminate the distributorship agreement in accordance with its terms became moot. It is therefore unnecessary to consider the assignments of error relating to the instruction that the plaintiff was not in default under the agreement on March 28, 1975.

The plaintiff sought to recover damages for profits lost as a result of the defendant's tortious interference with the plaintiff's sales of R-W precleaners. "The general rule is that prospective profits from an established business, prevented or interrupted by the tortious conduct of the defendant, are recoverable when it is proved (1) that it is reasonably certain such profits would have been realized except for the tort, and (2) that the lost profits can be ascertained and measured, from evidence introduced, with reasonable certainty. . . . Such lost profits must not be speculative, remote, or imaginary, but must be established with reasonable certainty by the evidence." *K & R, Inc. v. Crete Storage Corp.*, 194 Neb. 138, 144, 231 N.W.2d 110, 114 (1975).

In *D. W. Trowbridge Ford, Inc. v. Galyen*, 200 Neb. 103, 262 N.W.2d 442 (1978), this court approved a method of computing lost profits which was substantially similar to the method used by the plaintiff in this case. "The trial court awarded [lost profits] on a per unit basis by computing the average net profit per new unit sold from the financial statements and reports of the plaintiff which were in evidence. . . . This figure appears to be reasonably accurate as a matter of computation." *Id.* at 110, 262 N.W.2d at 447.

In the present case the plaintiff computed an average net profit per unit by averaging its net profit per unit from the 2 years immediately preceding the termination of the distributorship. The plaintiff then

established the total sales of R-W precleaners made by the defendant during the 5 years subsequent to the termination, a total of nearly 24,000 precleaner kits, an average yearly sale of over 4,600 kits. Multiplied by the plaintiff's average net profit per unit, this resulted in proof of annual lost profits of approximately $57,500 per year, or nearly $300,000 for the 5 years for which the plaintiff offered evidence. By using an average annual sales figure, the plaintiff accounted for some uncertainty that it would have sold exactly the same number of precleaners as defendant did after the termination. "'[L]oss of prospective profits may . . . be recovered if the evidence shows with reasonable certainty *both* their *occurrence* and the *extent* thereof. * * * Uncertainty as to the *fact* of whether any damages were sustained at all is fatal to recovery, but uncertainty as to the *amount* is not.'" *El Fredo Pizza, Inc. v. Roto-Flex Oven Co.*, 199 Neb. 697, 705, 261 N.W.2d 358, 363-64 (1978). All of plaintiff's calculations are supported in the evidence by business records of both the defendant and plaintiff. The jury's award of $250,000 was supported by the evidence.

The defendant's final contention is that the plaintiff was not entitled to recover an attorney fee. The trial court found that the plaintiff was entitled to recover an attorney fee under Neb. Rev. Stat. § 59-821 (Reissue 1978). The statute provides: "Any person who shall be injured in his business or property by any other person or persons, by reason of anything forbidden or declared to be unlawful by sections 59-801 to 59-828, may sue therefor . . . and shall recover actual damages . . . and the costs of suit, including a reasonable attorney's fee."

The jury found the defendant had conspired with Cranston to injure the plaintiff's business, restrain trade in R-W precleaners, create a monopoly, and acquire the plaintiff's business by unfair business practices as alleged by the plaintiff. Such a conspiracy is "forbidden or declared to be unlawful" by statute. See Neb. Rev. Stat. §§ 59-801, 59-802 (Reissue 1978).

The effect of the verdict was to permit the plaintiff to recover a reasonable attorney fee under § 59-821. The trial court did not abuse its discretion in the award of an attorney fee to the plaintiff.

There being no prejudicial error, the judgment is affirmed.

AFFIRMED.

CLINTON, J., dissenting.

I respectfully dissent because the majority opinion does not confront the issues raised on the appeal. An understanding of all the issues may be obtained by referring to the original opinion and dissent. *Diesel Service, Inc. v. Accessory Sales, Inc.*, 205 Neb. 381, 288 N.W.2d 258 (1980).

On the first appeal of this case the majority opinion held that because Accessory kept its ledger on the Diesel Service account on an "open account" basis, the question of whether Diesel Service was delinquent under the contractual provisions permitting termination of the contract was to be determined by regarding the sales and payments to have been made on the basis of an open account. The evidence at the first trial was that Diesel Service was delinquent when delinquency was computed on an invoice-by-invoice basis. There was no evidence at the first trial as to whether Diesel Service was delinquent if computations were made on the basis of an open account.

This court interpreted the contract and remanded for a new trial. At the retrial, Accessory introduced evidence, which was not contradicted, showing Diesel Service was delinquent even when payments were applied on an open account basis.

On this appeal Accessory complains because the trial court at the second trial instructed the jury as follows: "IT HAS BEEN ESTABLISHED IN PREVIOUS PROCEEDINGS IN THIS CASE THAT PLAINTIFF WAS NOT IN DEFAULT ON MARCH 28, 1975 AND THAT DEFENDANT HAD NO RIGHT TO

ATTEMPT TO TERMINATE THE CONTRACT BECAUSE OF PLAINTIFF'S ALLEGED DEFAULT." It contends that the jury should have been permitted to decide whether Diesel Service was delinquent when the open account method is applied.

Accessory relies upon the following principles. The doctrine of law of the case has no application where evidence upon a material point which is lacking at the first trial is produced at the second trial. *Master Laboratories, Inc. v. Chesnut*, 157 Neb. 317, 59 N.W.2d 571 (1953). The phrase "reversed and remanded for a new trial" is a general remand and the parties stand in the same position as if the case had never been tried. *Master Laboratories, Inc. v. Chesnut, supra.* I agree with the appellant. Under the above principles, the language of the majority opinion in the first case pertaining to direction of a verdict on the issue of delinquency would apply as the law of the case only where the evidence on the issue on retrial was the same as on the first trial. In this case it was not. This is a law action. On appeal we do not decide the facts. The trial court should have submitted to the jury the issue of delinquency of the account and Accessory's right to terminate in accordance with the terms of the contract. If Accessory had the right under the contract to terminate, then cancellation could not give rise to any liability on its part. *Hompes v. Goodrich Co.*, 137 Neb. 84, 288 N.W. 367 (1939).

I would reverse and remand for a new trial.