## McKEE *v.* CITY OF GRAND RAPIDS.

1. TAXATION—MUNICIPAL CORPORATIONS—SPECIAL ASSESSMENTS—PUBLIC IMPROVEMENTS—SEWERS.

    Where the common council of the city of Grand Rapids complied with the requirements of its charter and the provisions of the several special acts authorizing the building of a trunk sewer, and the erection of a flood wall, each improvement being paid for out of funds as provided in said special acts, there is no merit in the contention that there was a prohibited double improvement under a single assessment, although to save expense both improvements were carried along at the same time, by the same contractor, and under the same contract.

2. SAME—DOUBLE IMPROVEMENTS—IRREGULARITIES—ESTOPPEL.

    If there was any irregularity in this particular, plaintiffs are estopped from raising it by their conduct in standing by and seeing these public improvements going on without legal protest, and in failing to mention it in their appeal from the board of assessors to the common council under the charter provision requiring the grounds of appeal and matters complained of to be stated in writing.

3. SAME—ASSESSMENT DISTRICTS—DISCRETION OF OFFICERS—CONCLUSIVENESS—MISTAKE—FRAUD.

    The determination of municipal officers, in whom discretion

is vested to decide upon assessment districts and levies of assessments, is conclusive in the absence of mistake or abuse of discretion amounting to fraud.

4. SAME—GRAND RAPIDS CHARTER—REVIEW—EQUITY.

Under the charter of the city of Grand Rapids (Act No. 593, tit. 6, § 45, Local Acts 1905), any mistake or fraud in such proceedings may be reviewed in chancery and corrected where clearly shown.

5. SAME—SPECIAL TAXES—MISTAKE—FRAUD.

In an action by landowners to restrain the city of Grand Rapids from collecting certain special taxes levied upon plaintiffs' lands in said city, evidence *held*, to sustain the conclusion of the court below that there was such a palpable discrimination against plaintiffs and an unequal assessment relatively so out of proportion to benefits as to amount to a legal fraud, entitling them to a correction of such error on "equitable principles" as provided in defendant's charter.

6. SAME—CORRECTION OF MISTAKE—TENDER—EQUITY.

Where plaintiffs, before commencement of suit, tendered the city a certain sum, which was in excess of the amount fixed in the decree of the court below, and in their verified bill said upon oath that the amount so tendered was fair, just, and equitable for possible benefits in such improvements, this court, in correcting the error on "equitable principles" will modify the decree of the court below to correspond with the amount tendered.

Appeal from superior court of Grand Rapids; Dunham, J. Submitted June 6, 1918. (Docket No. 45.) Decided December 27, 1918.

Bill by James L. McKee and others against the city of Grand Rapids and another to enjoin the collection of special assessments. From a decree for plaintiffs, defendants appeal. Modified, and affirmed.

*Elvert M. Davis* and *Earl F. Phelps,* for plaintiffs.

*Ganson Taggart,* City Attorney, and *Charles A. Watt,* Deputy City Attorney, for defendants.

Steere, J.  Plaintiffs' bill seeks to restrain collection of certain special taxes levied upon their lands for a local improvement in the city of Grand Rapids called the "East Side Trunk Sewer."  When suit was begun the sewer had been constructed, the special tax assessed and the tax roll for the assessment district in the hands of the city treasurer who was about to proceed with enforcement of payment by a tax sale of plaintiffs' land delinquent for the special taxes assessed thereupon.  After answer and replication the case was duly heard on pleadings and proofs taken in open court.  Although certain technical objections were made to the tax proceedings involved, plaintiffs' most serious and insistently stressed objection to the taxes against their property was, as stated in their bill, that they are—

"grossly disproportionate to the benefits that have accrued or will accrue to the said property from the construction of the said sewer, and for the reason that the said assessments against the property of your respective orators are inequitable, unfair, excessive and discriminatory, and for the reason that the said assessment is arbitrary and is not applied with compliance to any uniform rule in the said assessment district and is not assessed by any tangible process of equal and fair distribution of benefit."

A volume of evidence, mostly documentary, was introduced showing the various official proceedings, steps taken and things done pursuant to them resulting in the construction of the sewer, and levy of this tax, and also a flood wall along the river at the same time.  The issue to which the oral testimony was largely devoted was whether the taxes in question were so excessive, unfair and discriminatory in fact as to call for equitable intervention by the chancery court.  The trial court so held, and, presumptively acting under authority of the city charter, made a re-

203—Mich.—34.

taxation or reduction of the taxes complained of, finding and decreeing in part as follows:

—"that the lands described in complainants' bill of complaint herein * * * and assessed for benefits by the board of assessors of the city of Grand Rapids upon the assessment roll for the construction of the 'East Side Trunk Sewer,' so-called, at $2,515, is excessive, inequitable and unjust in causing the complainants to pay towards such improvement a sum greatly in excess of the benefits received thereby, and that such assessment was a grave and gross mistake by said board of assessors, and is fraudulent and unjust as against said complainants, and should be decreased from $2,515 to $454. * * *

"It is therefore ordered, adjudged and decreed by the court now here, that the assessment upon complainants' property described in their bill of complaint, for the 'East Side Trunk Sewer,' so-called, for the sum of $2,515, be set aside as a void assessment, except as to the sum of $454, which shall be in full against said land and against said complainants for such improvement."

From this decree the city has appealed, contending that no ground is shown for equitable interference to disturb the judgment of the board of assessors provided by law to determine and decide, and that in any event the reduction made is grossly excessive, the tax imposed by the court being much less than that plaintiffs admitted would be a just and equitable assessment.

The three objections made against this special assessment by plaintiffs and argued in counsels' briefs are, that the same is excessive, not in proportion to benefits, unequal and oppressive, as before mentioned; that it involved a single assessment for a double improvement, and that the advertisement of plaintiffs' land for sale as delinquent did not comply with charter requirements.

Of the last objection it need only be noted in passing that defendant admits a technical failure to fully

comply with the charter in the respect pointed out, and that in any event the preliminary injunction granted at commencement of the suit halted further proceedings and rendered the taken steps to advertise the tax sale of this land on a specified date nugatory, so that re-advertisement would be a prerequisite to a valid sale of plaintiffs' land for the delinquent special taxes assessed against it.

Plaintiffs' contention that there was a prohibited double improvement under a single assessment is based upon the fact that a flood protection, or dock-line wall, was built along the east side of the Grand river at the same time the East Side Trunk Sewer which ran along the river just back of it was built and the work was done by the same contractor under a contract with the city which included both operations. This plaintiffs urge is forbidden by previous rulings of this court in *Clay* v. *City of Grand Rapids*, 60 Mich. 451, and *Peck* v. *City of Grand Rapids*, 125 Mich. 416.

Grand Rapids lies on both sides of the Grand river which flows southerly and centrally through it in a locality where the irregularities of the topography and recurring high stages of the river cause unusual difficulties and expense in providing for the more or less related necessities of surface drainage, sewage and flood protection. In addition to the power conferred by the city charter under which various improvements of that nature were made by the municipal authorities from time to time, special legislation was secured authorizing heavy bonding, when ratified by a plebiscite, for expenditures to relieve the situation by construction of large trunk sewers on both sides of the river and flood walls or dykes along it.

In 1905 the legislature passed a local act (Act No. 668) authorizing conversion of the so-called West Side Big Ditch in the city of Grand Rapids into a sewer,

its improvement and extension, authorizing the city to borrow not to exceed $120,000 by bonding for said purpose in anticipation of a levy and assessment of taxes to meet the same.

In 1907 a local act (Act No. 643) was passed authorizing the city to borrow $300,000 for the purpose of "establishing and constructing trunk sewer or sewers upon either side of Grand river, from or near the south city limits of said city, so far up the river or along or near either bank thereof, as may be found necessary by the common council of the city of Grand Rapids, in anticipation of the collection of assessments and taxes to defray the expenses and cost thereof," etc. Each of these local acts in regard to sewers authorizes the designation of benefited districts for special assessment and taxation in accordance with the methods provided in the city charter.

In 1907 a local act was passed by the legislature (Act No. 413), entitled:

"An act to authorize the sale of bonds by the city of Grand Rapids, Michigan, to meet the cost of flood protection of said city from the waters of Grand river and streams tributary thereto, including moneys heretofore used therefor."

This act authorized the issuing of $1,000,000 of bonds for such purpose, if approved by a popular vote, directing that the proceeds of the sale of such bonds, or such portion thereof as was found necessary, should be used—

—"exclusively for the protection from floods of Grand river and streams tributary thereto within the limits of said city by dykes or walls or both, or otherwise, and the scaling of the river bed within the city limits, or for such other method of protecting the public from their floods or unsanitary conditions as may be decided by a two-thirds vote of the common council; also their proceeds may be used to reimburse the city for moneys used since January 1, 1906, for flood protection on Indian Mill creek and Grand ·river."

Bonds issued for this purpose were to be "executed and certified in the same manner as bonds issued under said city charter for public improvements other than street improvement or sewer construction bonds," which under the charter are met by a general tax imposed therefor upon the whole city.

Under the provisions of those special acts and the city charter the common council took the requisite preliminary action necessary to authorize the needed improvements and the city proceeded with the work in accordance with approved and adopted plans, by scaling the river, building flood or dock walls along it and, more directly involved here, constructing a trunk sewer down the east side of it, picking up the openings or outlets of other sewers which emptied into the river, so as to carry their flow down stream to the pumping station at or near the city limits, and thereby both relieve the river from them within the city limits, and facilitate the discharge of the sewers which high water in the river at times obstructed. Proceedings were taken to authorize and provide payment for the flood wall under the local act upon that subject, entirely independent of the sewer proposition. Its location was necessarily at the river margin without regard to where the sewers ran. Under other appropriate legislation the common council determined the east side trunk sewer was a necessary public improvement and made provision for its construction. When the question of its exact location was under consideration it was suggested by the engineer's force of the board of public works, which had control of the improvement, that a great saving could be made by locating the sewer for a part of the distance closer to the flood wall and having the two improvements carried on contemporaneously or in combination, each to be paid for out of its separate fund.

Estimates for each, reports and resolutions were

had to this end and the work was carried on in one operation as proposed at a total cost of $370,675. The cost of the flood wall as computed (and so determined by resolution of the common council) amounted to $81,900. This was paid from the flood fund by direction of the council. The cost of constructing the east side trunk sewer, found to be $288,775, was by proper official action assessed pursuant to the provisions of Act No. 643, Local Acts of 1907, and the city charter. There was but a single assessment for that single improvement; the cost of the flood wall did not enter into it. It is not a case of doing one thing and calling it something else. There was no special district designated or special assessment spread for the wall, which was separately provided for by bonds under a different law, to be eventually paid by the city at large. There was no misnomer, misapprehension or deception in providing for and carrying on one public improvement in the guise of and under a provision of law applicable to another, as in the cases cited by plaintiffs; no confusion as to districts benefited could arise, one improvement being paid for by the entire city and the other by a district fixed by the council. The inhabitants of the city had opportunity to be heard on each of these public improvements, which were separately provided for and neither included in the other.

But conceding a technical irregularity in that particular, plaintiffs stood by and saw these public improvements going on and completed at heavy expense to the city without legal protest or objection. It was a pretentious undertaking of general interest, entered upon and carried out after long preparation and public discussion. The property involved here was low land near the river and necessarily within the assessment district; some of plaintiffs had sold to the city from other land not far distant the right of way for these

improvements, receiving $5,500 therefor, exaction of which is suggested as influencing official action in imposing the tax complained of. Plaintiffs appealed from the board of assessors to the common council, as authorized by the city charter which required the grounds of appeal and matters complained of to be in writing, without mentioning this objection. Failure to make timely and legal objection after knowledge and opportunity estops them from later contesting the tax on such ground. *Moore* v. *McIntyre,* 110 Mich. 237; *Auditor General* v. *Bishop,* 161 Mich. 117.

The property of plaintiffs upon which the taxes complained of are assessed is vacant, said to consist of about 3 1/3 acres, and lies along the west side of Market street north of Wealthy avenue in the southerly portion of the city, from a half to three-fourths of a mile below its business center, near and on the east side of Grand river in a location which plaintiffs' counsel designates as a factory district. It has side-track facilities at the rear, and, as Mr. McKee testified, is suitable for houses, light manufacturing, coal yards and, he expected or hoped, would be available for wholesale business. It is platted into lots fronting on Market street, which is a graded, paved and sewered thoroughfare. On the west, at its rear, it joins a tract of land belonging to the city, known as the Market property, consisting of about 20 acres which fronts along the river, and has upon it a city market, lighting station, baseball park, garbage burner, dog pound and other buildings. Most of the city market property was formerly an island in the river with a channel to the east, covering what is now a portion of plaintiffs' property, deep enough to be navigable by steamboats then in use, but which in the progress of improvements was filled in and the river confined to the west channel. Litigation over the subject terminated in what is called a "compromise line" running along the

bed of the old east channel and dividing it between the city, which owned the island, and the shore owners whereby plaintiffs' lots acquired 48 feet additional depth on the west end. The lands in that locality along the river were naturally low, just how low relatively, how much affected by the condition of the river, and how much different descriptions had been filled in, or raised, was a fruitful topic of more or less conflicting testimony. Plaintiffs' land and the city market had been raised by filling to practically a level with Market street, as had other descriptions in that vicinity, while others had not. The market property was taxed for this sewer, which passed through it, at $2,724.

It is accepted as a general rule that the determination of municipal officers in whom discretion is vested to decide upon assessment districts and levies of assessments should be treated as conclusive in the absence of mistake or abuse of discretion amounting to fraud. That mistake or fraud in such proceedings which prejudices the property rights of the person whose property is taxed may be reviewed in chancery and corrected where clearly shown is recognized in defendant's charter as follows:

"No mistake or error in the proceedings in regard to the opening or improvement of streets, avenues, public ways or alleys or in the construction of sewers, or in the assessment or collection of costs or expenses thereof, or in the proceedings for the assessment or collection of municipal taxes in said city, or any irregularity in any special or city tax roll by reason of the proceeding therefor not being had within the time required by law, or the property having been assessed to the wrong owner, or any irregularity, informality or omission or want of any matter of form or substance in the proceedings that does not prejudice the property rights of the person whose property is taxed, shall defeat the city in the collection thereof; but any such errors may be corrected on equity prin-

ciples under the direction of the common council of the city, if discovered before suit is brought thereon or by the court after suit is instituted, and the equitable amount due the city may be enforced as though no such error had occurred." Title 6, § 45, Act No. 593, Local Acts 1905.

To sustain the charge of fraudulent assessment which prejudiced their property rights, plaintiffs amongst other things introduced testimony tending to show that in the so-called "flood district" and within the vicinity of their land certain surrounding property in many respects similarly situated was assessed so low in comparison with theirs as to indicate an abuse of discretion amounting to fraud. Summarized from this comparative proof in relation to surrounding descriptions it appeared that, computed on both a basis of front foot and square foot assessment, plaintiffs' property was assessed $2.50 per front foot and 17 mills per square foot, while land bounding it on the west was assessed 60 cents per front foot and 1 to 3.2 mills per square foot; on the north 44 to 60 cents per front foot and 1 to 3.2 mills per square foot; on the east across the street 58 to 90 cents per front foot and 1 to 7 mills per square foot; upon the south 25 cents to $1.15 per front foot and 2.2 to 2.6 mills per square foot. Without going through the testimony in full detail, for better understanding of their comparative value the following is fairly illustrative: The city market property consisted of 20 acres with various buildings upon it. It was practically upon the same level and adjoined plaintiffs' land on the west. While not fronting upon any street, it fronted on the river and had a public approach from Market street. It received direct benefit of this sewer, which ran through it but did not touch plaintiffs' which was upon a sewered street for which a special sewer tax had been imposed and paid by plaintiffs. This property was

assessed at 60 cents per front foot and 3.2 mills per square foot. A piece of land called the Godfrey property, just east of and mostly lower than plaintiffs', was assessed at 82 cents per front foot and 7 mills per square foot. Four lots directly across Market street from the center of plaintiffs' property and over four feet lower, were assessed 90 cents per front foot and 7 mills per square foot. Two lots directly across Market street at the south end of plaintiffs' property, and much lower, but occupied by three dwelling houses, were taxed 58 cents per front foot and 11 mills per square foot. A piece of land called the Kent parcel, lying across Market street east of the north end of plaintiffs' land and running north one block, in the flood district but some higher than plaintiffs', was assessed 44 cents per front foot and one mill per square foot. A piece of property of 3 1/3 acres belonging to the gas company, several feet lower than plaintiffs', situated about 150 feet south of it and across Market street, upon which was a gas plant, was assessed at $1.15 per front foot and 2.5 mills per square foot. Land occupied by the street railway power plant, lying just south of the gas company property, was assessed at $1.09 per front foot and 2.7 mills per square foot. A piece of property belonging to the Manufacturers' Realty Company, upon which was a box factory, lying across Market street and some distance southwest of plaintiffs' property but in the same flood district and much lower, was assessed 70 cents per front foot and 2.4 mills per square foot. To the extent these lands are shown to be lower than plaintiffs' and more subject to be flooded, they would appear to receive greater benefit from the improvement. There was also some property across Wealthy avenue and southwest of plaintiffs' land, much lower and in the flood district, upon which under an agreement relative to right of way the city had contracted to pay

all of this special assessment in excess of $250. There was no excess. It was assessed 28 cents per front foot and 2.3 mills per square foot, the total being $246. The mathematical accuracy of these figures fairly appears. Their significance is a matter of controversy.

The proof as to area, elevation above the river and various assessments and comparative computations show that relatively plaintiffs' land was assessed about four times lands near it in the flood district on the west, five times as much as the lands shown on the north, five times as much on the east and from three to ten times as much on the south, with no proof of greater benefits to account for such marked discrepancy.

The record well sustains the conclusion of the trial judge that the evidence shows a palpable discrimination against plaintiffs and unequal assessment relatively so out of proportion to benefits which are proven or can be found from the testimony as to be in legal effect a fraudulent assessment, or abuse of discretion, or at best a material mistake prejudicial to plaintiffs' property rights entitling them to a correction of such error on "equitable principles," as provided in defendant's charter.

It is not, however, necessary to accept as proven plaintiffs' direct charges of intentional fraud or personal purpose to produce such result on the part of the assessing officers. The assessment of this large district with several thousand descriptions of land, of varying kinds, shapes and conditions, benefited in varying degrees according to location and elevation, was a formidable undertaking in which occasional misapprehension and mistakes on the part of the assessors were likely to occur. A few extracts from their testimony illustrate this. One of them interrogated as to a certain description answered as follows:

"*Q.* Do you know that you assessed the street railway company at 2.6 mills and McKees' (plaintiffs') at 17 mills per square foot per area?

"*A.* Who did that figuring?

"*Q.* If those are the figures, it would be a just assessment, would it?

"*A.* No.   *   *   *   We intended to assess the lower land that was more liable to flood for greater benefits than the land that was higher and less liable to flood."

Asked about the gas company's land which the testimony shows was several feet lower than plaintiffs' he said:

"It lies a little higher than McKees'. I so considered it at the time we made the assessment and do now."

When asked about a tract of land directly across Market street east of plaintiffs', shown by the testimony to have been in the flood district and over four feet lower, he said:

"That was benefited less than McKees'. Quite a bit less. It is on the east side of Market avenue where it is high and dry, good land."

Another assessor, asked about a piece of land in the flood district called the Wagemaker property and shown to be much lower than the plaintiffs,' testified:

"I should say that the Wagemaker property was better located at that time. It was higher. It was not flat land.   *   *   *   In my judgment, at this time, the Wakemaker property would be about equally benefited with McKees' property north of Wealthy.   *   *   * I don't know as I can give you any other reason why we assessed McKees' property north of Wealthy at 11 or 12 times as much as we did the Wagemaker property.   *   *   *   I have stated that McKees' land south of Wealthy had a higher elevation than the McKee land north of Wealthy. That is the way we understood it at the time we made the assessment."

The property involved in this suit and much of that with which it is compared lies north of Wealthy ave-

nue. This assessor said of their method of assessment, "North of Wealthy we had another territory or district and we figured that per square foot." Plaintiffs' 3 1/3 acres was assessed at $2,515, and the adjoining market property of about 20 acres at $2,724. One assessor, when asked how they arrived at $2,724 for the market property, answered, "You have got me guessing; I don't remember."

The trial court apparently concluded plaintiffs' property should be assessed no more per acre than the market property, and reduced the assessment to $454. Defendants urge various distinctions in the two properties other than acreage and press reasons against so radical a reduction, including admissions in pleading and estoppel by tender.

Before commencement of this suit plaintiffs tendered the city $1,355.28 in full payment of their various assessments in controversy amounting to $2,515. This tender was made by plaintiff J. L. McKee, one of the owners, who was authorized to represent his coplaintiffs. He is an attorney and had charge of the transaction. He was familiar with the subject and showed by his testimony a comprehensive knowledge of the property in that locality, its relative values, and the uses to which it was adapted, had evidently studied and compared these assessments, etc., and was experienced in such matters. In plaintiffs' verified bill they all say upon their oaths that the "amount so tendered by the said McKee was considered by said plaintiffs at the time he made such tender to be a fair, just and equitable amount that should be assessed upon said property for any possible benefits derived from said east side trunk sewer."

It is true the money was not deposited in court, nor is any formal withdrawal of the tender shown, and while not operating technically to preclude plaintiffs from asserting in suit their various defenses against

the assessment complained of, it is a persuasive consideration in determining "the equitable amount due the city" under the assessment. It is stated as a general principle that:

"A tender is ordinarily an admission of an amount due equal to the sum tendered even though the tender is insufficient in form, or is made in a case where a valid legal tender cannot be made; and it dispenses with proof of everything that would otherwise be necessary to enable plaintiff to recover  *  *  *  to the extent of the sum admitted to be due." 38 Cyc. p. 163. Citing numerous cases.

Upon this record as a whole, and with due regard to the evidence bearing upon actual benefits conferred, as well as plaintiffs' tender and their views expressed under oath in their bill that the amount was fair, just and equitable for possible benefits from such improvements, we conclude that in correction of the error on equitable principles the decree should be modified in amount to correspond with the amount tendered. So modified it will stand affirmed, without costs to either party.

OSTRANDER, C. J., and BIRD, MOORE, BROOKE, FELLOWS, STONE, and KUHN. JJ.. concurred.