*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

HARBOR ISLES MARINE, LLC, formerly known as LASALLE'S LANDING MARINA,

        Plaintiff/Counterdefendant-Appellant,

and

AWOHIM, LLC, AWM OPERATIONS, LLC, and AWM-SJIYC SHARED RECREATIONAL CORPORATION,

        Plaintiffs-Appellants,

v

ESTATE OF JAY CHODOCK, JAMES SMITH, CHARLES WHITE, JIMENA CAICEDO, also known as JIMENA ZEIGERT, DANE'S LANDING, CONDOMINIUM ASSOCIATION, INC, ST. JOE ISLE YACHT CLUB, INC., and DAVID GOULD,

        Defendants-Appellees,

and

HARBOR ISLE MOORINGS CONDOMINIUM ASSOCIATION, INC.,

        Defendant/Counterplaintiff-Appellee.

UNPUBLISHED
November 20, 2025
9:28 AM

No. 367554
Berrien Circuit Court
LC No. 2022-000080-CB

Before: LETICA, P.J., and M. J. KELLY and MARIANI, JJ.

PER CURIAM.

        Appellant Harbor Isles Marine, LLC (Harbor Isles) challenges on appeal (1) the trial court's order granting involuntary dismissal and entering final judgment in favor of appellee

Moorings Condominium Association, Inc. (Moorings); (2) the trial court's order granting summary disposition in favor appellee David Gould; and (3) the trial court's order granting summary disposition in favor of appellee St. Joe Isles Yacht Club, Inc. (SJIYC). We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This civil action arises from a business dispute between Harbor Isles, which operates a private marina, and three condominium associations that own and manage boat slips in the marina—SJIYC, Moorings, and Dane's Landing. In 1984, LaSalle's Landing Development Inc. (LLD) began constructing a private marina on the St. Joseph river in St. Joseph, Michigan. The marina would continue to develop in phases over the next several years, and would eventually become known as Anchors Way Marina. LLD executed a master deed in November 1984 that established LaSalle's Shores, a marina condominium community—in 1987, LaSalle's Shores would be renamed SJIYC. This master deed incorporated multiple attachments, including a Shared Recreational Facilities Easement and Agreement (SJIYC rec agreement) and a general ingress and egress easement. The master deed also established that the covenants and restrictions created by the deed and its attachments "shall be deemed to run with the land and shall be burden [sic] and a benefit to [LLD], its successors and assigns, and any persons acquiring or owning an interest in the said real property . . . ."

The SJIYC rec agreement was between an entity called LaSalle's Landing Marina (LLM)[1] and SJIYC. The agreement provided for the shared use of certain recreational facilities by LLM's boat slip lessees and SJIYC's condominium association members; the shared facilities comprised swimming, shower, and laundry facilities, as well as a designated fish-cleaning area. The SJIYC rec agreement also established a management committee to handle the management and operation of the shared recreational facilities. The agreement provided that the committee would consist of four members—two appointed by LLM and two by SJIYC, with LLM and SJIYC each determining the term lengths of their respective representatives.

In 1988, a parcel of land (which had been expressly set aside in the original master deed for future development) was conveyed to an entity called Slabaugh, Inc.; at the same time, LLD separately assigned its development rights to Slabaugh. In 1989, Slabaugh executed a master deed that formed Moorings, the second condominium association at the marina. The Moorings master deed incorporated by reference its own Recreational Facilities Usage Agreement (Moorings rec agreement) which was similar to the SJIYC rec agreement; it also allowed for use of the marina pool, shower, laundry, and fish-cleaning area. This agreement was between Slabaugh and Moorings, and was attached to the Moorings master deed. The Moorings rec agreement made clear that these shared facilities were administered pursuant to the SJIYC rec agreement. There were also access easements (easements for ingress and egress) for the benefit of Moorings included with the Moorings master deed. The Moorings master deed provided that it was establishing Moorings subject to, in relevant part, "the covenants, conditions, restrictions, uses, limitations, and affirmative obligations set forth in" the deed and its attachments, including the Moorings rec

---

[1] While LLD was the corporate-entity developer that created the marina, LLM was a co-partnership that owned the subject parcel of land and the recreational facilities on that land.

agreement, "all of which shall be deemed to run with the land and shall be a burden and a benefit to [Slabaugh], its successors and assigns, and any persons acquiring or owning an interest in the said real property, their grantees, successors, heirs, executors, administrators, and assigns." In 2001, Slabaugh executed another master deed forming Dane's Landing, a third marina condominium project.[2]

Although the condominium associations' formation documents are well represented in the record, the history of the development rights and ownership interests of the marina is not. As is relevant here, in 2014, an entity called Mikler Harbor Investments, LLC (Mikler Harbor) executed a deed quitclaiming certain property to Harbor Isles. Harbor Isles maintains that they gained ownership of the marina property through this deed. Beyond the quitclaim deed itself, there is no evidence in the record about Mikler Harbor, what interest it may have acquired in the marina property, or when or how it may have acquired that interest. The quitclaim deed includes a general clause that it is "[s]ubject to easements and building and use restrictions of record and further subject to all taxes and special assessments which shall hereafter become due and payable."

Beginning in late 2020 and carrying over into 2021, Harbor Isles attempted to increase the fees owed by the condominium associations for maintenance of certain aspects of the marina, including the shared recreational facilities. Harbor Isles created AWOHIM, LLC and AWM Operations, LLC to manage the properties and facilities at the marina. In conjunction with SJIYC, Harbor Isles also formed AWM-SJIYC Shared Recreational Corporation to manage and administer the shared recreational facilities.

Harbor Isles proposed new annual budgets that, according to Moorings' secretary treasurer, were "significantly higher" than in previous years; in December 2021, Harbor Isles attempted to retroactively recover fees from the condominium associations at the new increased rates for the years 2019, 2020, and 2021. In total, Harbor Isles sought $333,000 from the condominium associations.

In July 2021, after the parties could not agree on renegotiated terms for the fees, SJIYC sent a notice of termination of the SJIYC rec agreement to Harbor Isles. SJIYC also notified Moorings of its decision and the Moorings board convened to discuss the situation. The board concluded that they would withdraw from the Moorings rec agreement, and sent notice of their decision in September 2021.

Prior to the 2022 boating season, a new key fob system was installed at Anchors Way Marina. In March or early April, Harbor Isles began denying access to the marina (through the main gate) to members of the condominium associations. That May, Harbor Isles also padlocked an unsecured pedestrian gate, preventing any further access to the marina.

---

[2] Harbor Isles also sued Dane's Landing in this case, but Harbor Isles has not challenged on appeal any of the trial court's rulings as to Dane's Landing; we limit our discussion of that aspect of the case accordingly.

Coinciding with the marina lockout, Harbor Isles filed its complaint in the instant lawsuit in April 2022.[3] The complaint named eight defendants: the three condominium associations (SJIYC, Dane's Landing, and Moorings) as well as five individual named defendants—James Smith, Jay Chodock, Charles White, Jimena Ziegert, and David Gould—each of whom held positions as officers or directors with Moorings or SJIYC. The complaint alleged six claims: Count I—declaratory judgment; Count II—an accounting; Count III—breach of deeds and bylaws (against the condominium association defendants); Count IV—slander of title (against the individual named defendants); Count V—slander of title (against the condominium association defendants); and Count VI—breach of fiduciary duty (against the individual named defendants).

In response to Harbor Isles' lockout measures, in May 2022 Moorings and Dane's Landing filed a joint motion for a temporary restraining order and for a preliminary injunction. Ultimately, the trial court granted preliminary injunctions in favor of both Dane's Landing and Moorings, preventing Harbor Isles from interfering with their access to the marina.

In June 2022, Moorings filed counterclaims against Harbor Isles. That November, Moorings moved for partial summary disposition on Count III of its counterclaims[4] and on Count I of Harbor Isles' complaint. The trial court held a hearing in January 2023 and, shortly thereafter, issued an order granting Moorings' motion as to Count III of its counterclaims, permanently enjoining Harbor Isles "from interfering with Moorings' rights" under Moorings' access easement. The court denied Moorings' motion as to Count I of Harbor Isles' complaint, but as to Harbor Isles only.[5] The court also made findings of fact that Moorings' attempt to withdraw from the Moorings rec agreement was ineffective.

In February 2023, Gould moved for summary disposition. After a response and reply, the trial court held a hearing that April. The same day, the trial court entered an order granting summary disposition in Gould's favor as to all claims pleaded against him, but Harbor Isles has only challenged on appeal the court's ruling as to Count VI, breach of fiduciary duty. As the court articulated during the hearing, the motion was granted on that claim under MCR 2.116(C)(5), (C)(8), and (C)(10) because Harbor Isles had failed to plead or show that Gould owed a fiduciary duty to Harbor Isles.

In June 2023, SJIYC moved for summary disposition. Harbor Isles responded, and a hearing was held later that month. The trial court entered an order granting the motion and dismissing the claims against SJIYC with prejudice. The trial court announced the ruling at the hearing. For Counts I and III—the focus of Harbor Isles' appeal with respect to SJIYC—the trial court stated that, from looking at the complaint, it was "difficult . . . to find specific allegations" and that "there is very little mentioned about" SJIYC. The court observed that, in the section of the complaint devoted to SJIYC, Harbor Isles had not articulated what SJIYC did to violate any of

---

[3] AWOHIM, AWM Operations, and AWM-SJIYC were also named plaintiffs.

[4] Count III of Moorings' counterclaims sought a declaratory judgment regarding Harbor Isles' interference with Moorings' access easement.

[5] The court granted summary disposition to Moorings on Count I with respect to AWOHIM, AWM Operations, and AWM-SJIYC.

the binding documents. Accordingly, the court concluded that summary disposition under MCR 2.116(C)(8) was warranted on those claims.

Also in June 2023, Harbor Isles and Moorings filed cross-motions for partial summary disposition regarding the remaining claims against each other. The trial court addressed these motions at the same June 2023 hearing mentioned above. In the resulting written order, the court dismissed with prejudice all claims asserted by plaintiffs other than Harbor Isles (i.e., AWOHIM, AWM Operations, and AWM-SJIYC), and all of Harbor Isles' claims against Moorings except for Count I of the complaint. As to Count I, the court reiterated its prior determination that Moorings' attempted withdrawal from the Moorings rec agreement was ineffective, and further found that the only question of material fact remaining for trial was what amount, if any, Moorings may owe to Harbor Isles under the rec agreement from the date of Moorings' ineffective withdrawal through trial.[6] The court also dismissed two of Moorings' counterclaims, determined that two others (regarding the Moorings rec agreement and Moorings' access easement) were preserved for trial, and restated its prior award of a permanent injunction regarding Moorings' access easement.

In July 2023, the trial court conducted a bench trial between Harbor Isles and Moorings on the remaining claims and counterclaims. Harbor Isles presented its proofs over the first two days of trial, with most of that time spent on the testimony of Scott Sinar, who was one of Harbor Isles' managers. After the conclusion of Harbor Isles' proofs, Moorings moved for involuntary dismissal and entry of final judgment in its favor. The court heard argument, took a brief recess, and then orally granted the motion. The court found that the Moorings rec agreement was originally between Slabaugh and Moorings, and the record was devoid of any evidence connecting Slabaugh to Harbor Isles; the court explained that nothing in Harbor Isles' proofs showed when, how, or to whom Slabaugh may have transferred its rights under the Moorings rec agreement, nor how Harbor Isles may have acquired those rights—"there was nothing to connect those two entities." And relatedly, as the court further found, there was no evidence of what rights Mikler Harbor had and thus quitclaimed to Harbor Isles. Shortly after trial, the court rendered a written order granting involuntary dismissal of Counts I and III of Harbor Isles' complaint, confirming its prior ruling that Harbor Isles was permanently enjoined from interfering with Moorings' rights under its access easement, and entering final judgment. This appeal followed.

## II. INVOLUNTARY DISMISSAL AS TO MOORINGS

We turn first to Harbor Isles' challenge to the trial court's award of involuntary dismissal in favor of Moorings. The trial court granted involuntary dismissal because Harbor Isles' proofs at the bench trial failed to establish that Harbor Isles was Slabaugh's successor or assign such that Harbor Isles was entitled to enforce the Moorings rec agreement against Moorings. The trial court did not err in this assessment.

---

[6] The court also found that "the term 'Usage Fee' as used in the [Moorings rec agreement] is vague and ambiguous" but that (1) the fee would not include any attorney fees incurred by Harbor Isles and (2) its collection would require that the facilities at issue were offered for Moorings' use during the time to which the fee applies.

"An appellate court reviews de novo a trial court's ruling on a motion for an involuntary dismissal." *PF v JF*, 336 Mich App 118, 126; 969 NW2d 805 (2021) (citation omitted).[7] We review the trial court's findings of fact supporting that determination for clear error. *Williamstown Twp v Hudson*, 311 Mich App 276, 289; 874 NW2d 419 (2015). "A trial court's findings are considered clearly erroneous where we are left with a definite and firm conviction that a mistake has been made." *Id.* (quotation marks and citation omitted).

As the trial court correctly recognized, Harbor Isles offered no evidence at trial of any conveyance, assignment, or other transaction or connection between Slabaugh and Harbor Isles. Instead, at trial, Harbor Isles proffered a 2014 quitclaim deed through which an entity called Mikler Harbor quitclaimed to Harbor Isles certain property described in the deed, "[s]ubject to easements and building use restrictions of record and further subject to all taxes and special assessments which shall hereafter become due and payable." According to Harbor Isles, this deed establishes its ownership of the property that includes the shared facilities at issue and, because the Moorings rec agreement runs with the land, nothing more is needed to demonstrate Harbor Isles' entitlement to enforce that agreement.

The parties do not dispute that the Moorings rec agreement runs with the land. But that proposition alone does not establish Harbor Isles' entitlement to enforce the agreement as Slabaugh's successor or assign. Assuming the property in the quitclaim deed comprised the property at issue as Harbor Isles claims,[8] the record is devoid of information regarding exactly what rights or interests Mikler Harbor may have possessed in that property and thus conveyed to Harbor Isles. As a quitclaim deed, Harbor Isles only received whatever interest, if any, Mikler Harbor may have had in the specified property. See, e.g., *Michigan Dep't of Natural Resources v Carmody-Lahti Real Estate, Inc*, 472 Mich 359, 377-378; 699 NW2d 272 (2005) ("A quitclaim deed is, by definition, a deed that conveys a grantor's complete interest or claim in certain real property but that neither warrants nor professes that the title is valid.") (cleaned up); *Frost v Cockerham*, 164 Mich App 759, 765-766; 417 NW2d 599 (1987) ("A quitclaim deed conveys only the grantor's interest.") (citations omitted). Harbor Isles offered nothing to explain who Mikler Harbor was; what rights or interests in the property it may have obtained; when, how, and from whom it may have obtained those rights or interests; and whether and how that chain of title ultimately connected back to Slabaugh. Accordingly, while Harbor Isles' evidence may have shown that Harbor Isles possessed whatever rights or interests in the property Mikler Harbor had,

---

[7] At the bench trial, Moorings initially styled its motion as for directed verdict, but as the trial court correctly observed, a motion for directed verdict in a bench trial is treated as motion for involuntary dismissal under MCR 2.504(B)(2). See *Samuel D Begola Servs, Inc v Wild Bros*, 210 Mich App 636; 534 NW2d 217 (1995).

[8] On appeal, Moorings argues that Harbor Isles never identified the actual location of the property referenced in the Moorings rec agreement. The Moorings rec agreement contains a legal description of land, but it seemingly differs on its face from the description in the quitclaim deed. In reply, Harbor Isles contends that it had an interest in the land covered by the Moorings rec agreement, but it was improperly prevented from introducing evidence of that fact through its representative, Scott Sinar. Given the analysis above, however, it is not necessary to resolve this particular point of contention between the parties.

-6-

it did not establish what the nature and scope of those legal rights or interests were—namely, that Mikler Harbor was Slabaugh's successor or assign such that Harbor Isles necessarily assumed that status through the quitclaim deed and could enforce the Moorings rec agreement as a result.

In resisting this conclusion on appeal, Harbor Isles argues that no further proof was necessary because the quitclaim deed provided that its conveyance was "[s]ubject to easements and building use restrictions of record," and the covenants set forth in the Moorings rec agreement had been recorded along with the Moorings master deed. In support, Harbor Isles cites *Conlin v Upton*, 313 Mich App 243, 260; 881 NW2d 511 (2015), which recognized that, if "the covenants [at issue] are structured to run with the land, a subsequent purchaser will be bound by the covenants if he or she purchases the land with actual or constructive notice of the covenants," and "[a] subsequent purchaser is on constructive notice that his or her use of the property will be subject to the covenants when the covenants appear in the purchaser's chain of title." (Citations omitted.) This may demonstrate, as Harbor Isles maintains, that whatever right or interest in the property Harbor Isles received from Mikler Harbor would be subject to any recorded easements or restrictions. See, e.g., *Frost*, 164 Mich App at 766. But it does not demonstrate what actual right or interest in the property Mikler Harbor possessed, and thus Harbor Isles received, in the first place. See *id*. at 765-766. And nothing in *Conlin*—or any other authority identified by Harbor Isles—suggests that Harbor Isles can enforce and benefit from a covenant that runs with that property without proving the chain of title to the property through which it, in fact, received that claimed right. See also, e.g., *Greenspan v Rehberg*, 56 Mich App 310, 323; 224 NW2d 67 (1974) (cited by Harbor Isles for the proposition that "the privity of estate requirement has been fulfilled" where "[t]he chain of title with respect to both the easement and dominant estate is *unbroken* from the defendants . . . to the plaintiffs") (emphasis added).

Harbor Isles next argues that it was improperly prevented from providing proof of title at the bench trial through the testimony of its representative, Scott Sinar. The record, however, does not bear out this claim. In particular, nothing in the record indicates that Mr. Sinar had knowledge or information that would have been adequate to cure the chain-of-title deficiency discussed above. He testified that he did not become involved with Harbor Isles or aware of the Moorings master deed or Moorings rec agreement until 2018, and that he did not draft, sign, or otherwise have personal involvement in any of those documents or the Mikler Harbor quitclaim deed. And while he stated he reviewed documents regarding Harbor Isles' ownership of the marina, he did not suggest any of those documents went beyond what Harbor Isles has otherwise produced.[9] Nor, for that matter, did Harbor Isles make any argument to that effect to the trial court in opposing Moorings' motion for involuntary dismissal, or suggest it had additional proofs on chain of title

---

[9] Furthermore, when asked for his opinion regarding to whom Moorings owed payment under the Moorings rec agreement, Mr. Sinar identified not Harbor Isles, but another entity that had already been dismissed from the lawsuit. Specifically, Mr. Sinar said, "Well we claim that AW, the new entity that was set up to administer is owed the money." It appears that, by "AW," Mr. Sinar was referring to one of the "AW" entities that had previously been plaintiffs in the lawsuit—AWOHIM, AWM Operations, or AWM-SJIYC.

that it had not yet offered. Harbor Isles has failed to demonstrate any error by the trial court in its handling of Harbor Isles' proofs on this point at trial or its assessment of their adequacy.

Lastly, Harbor Isles stresses that, in prior filings before the trial court, Moorings admitted that Harbor Isles was Slabaugh's successor in interest. Harbor Isles is correct that, in certain of its trial-level filings, Moorings described Harbor Isles in this fashion. Harbor Isles did not, however, raise this to the trial court as a basis for denying Moorings' motion for involuntary dismissal. See *Tolas Oil & Gas Exploration Co v Bach Srvs & Mfg, LLC*, 347 Mich App 280, 289; 14 NW3d 472 (2023) (explaining that, under the "raise or waive" rule of appellate review for civil cases, "the party asserting error . . . must show that the same basis for the error claimed on appeal was brought to the trial court's attention" and "[i]f a litigant does not raise an issue in the trial court, this Court has no obligation to consider [it]"). Nor is the argument particularly well presented on appeal. In its brief on appeal, Harbor Isles did not identify the argument in its questions presented and only mentioned it in a passing footnote. See *Maple BPA, Inc v Bloomfield Charter Twp*, 302 Mich App 505, 517; 838 NW2d 915 (2013) ("A party abandons an issue when it fails to include the issue in the statement of questions presented in its appellate brief and fails to provide authority to support its assertions."); see also *Busch v Holmes*, 256 Mich App 4, 12; 662 NW2d 64 (2003). Moorings correspondingly did not address the argument in its responsive briefing. Harbor Isles then attempted to use its reply brief to argue the point at greater length, but still then offered no caselaw to support its suggestion that involuntary dismissal was improper on this basis. See *Blazer Foods, Inc v Rest Properties, Inc*, 259 Mich App 241, 252; 673 NW2d 805 (2003) (explaining that "[r]eply briefs may contain only rebuttal argument, and raising an issue for the first time in a reply brief is not sufficient to present the issue for appeal," and also that a party waives an issue on appeal by giving it "cursory treatment"); see also *Equity Funding, Inc v Village of Milford*, 342 Mich App 342, 348; 994 NW2d 859 (2022).

And even if that argument were properly preserved and presented, it does not appear to have particular merit. The filings Harbor Isles identifies pertain to Moorings' prior requests for partial summary disposition and for an order enjoining Harbor Isles from interfering with Moorings' access easement. Harbor Isles has failed to substantiate its suggestion that, simply because Moorings did not contest Harbor Isles' claimed successor status at those prior stages of the litigation, Moorings was foreclosed from holding Harbor Isles to its proofs on that point at trial. Harbor Isles argues that Moorings secured injunctive relief against it on the basis of its status as successor to Slabaugh under the access easement, and so Moorings, having obtained a favorable result based on that status, should not now be allowed to obtain a favorable result by denying that same status. The injunctive relief in question, however, pertained to the access easement, which was distinct from the Moorings rec agreement at issue here, and Moorings repeatedly stressed in seeking that relief that the rec agreement was "[w]holly independent of and separate from" the access easement, which "does not implicate shared use facilities or associated usage fees." And regardless, the propriety of the injunctive relief awarded against Harbor Isles did not depend on its successor status. Harbor Isles, for instance, has offered nothing to suggest that, if it had not been assumed to be Slabaugh's successor, it would have had any more right or basis to impede or interfere with Moorings' access under the easement. Accordingly, Harbor Isles has not shown grounds for reversal on the basis of this argument.

In sum, the trial court did not err in granting involuntary dismissal to Moorings.

### III. SUMMARY DISPOSITION AS TO GOULD

We turn next to Harbor Isles' challenge to the trial court's grant of summary disposition in favor of Gould. In its complaint, Harbor Isles sued Gould (along with the other individual named defendants) for breach of fiduciary duty. The trial court granted Gould's motion for summary disposition on that claim because Harbor Isles had not demonstrated, through its allegations or otherwise, what fiduciary duty Gould owed to Harbor Isles. Harbor Isles has failed to show an error in this determination.[10]

The trial court's written order granted Gould's motion for summary disposition on Count VI (breach of fiduciary duty) under MCR 2.116(C)(5), (8), "and/or" (10). The court identified those same bases when pronouncing the ruling at the hearing.

Appellate courts review the grant or denial of summary disposition de novo. *LaFontaine Saline, Inc v Chrysler Group, LLC*, 496 Mich 26, 34; 852 NW2d 78 (2014).

> Summary disposition under MCR 2.116(C)(8) is appropriate where the complaint fails to state a claim on which relief may be granted. A motion for summary disposition under MCR 2.116(C)(10) challenges the factual sufficiency of the complaint, with the trial court considering the entire record in a light most favorable to the nonmoving party. [*Id*. (footnotes omitted).]

Summary disposition under MCR 2.116(C)(5) tests whether a party has standing to sue. See *UAW v Cent Michigan Univ Trustees*, 295 Mich App 486, 493; 815 NW2d 132 (2012). This Court reviews de novo "the legal question of whether a party has standing to sue" and, in so doing, "must consider the pleadings, depositions, admissions, affidavits, and other documentary evidence submitted by the parties." *Id.* (cleaned up).

We agree with the trial court's conclusion that Harbor Isles has failed to adequately plead or otherwise demonstrate the existence of a fiduciary relationship between it and Gould. "A fiduciary relationship is one in which one person is under a duty to act for the benefit of the other on matters within the scope of the relationship." *Murphy v Inman*, 509 Mich 132, 146; 983 NW2d 354 (2022) (quotation marks omitted). "[A] fiduciary relationship arises from the reposing of faith, confidence, and trust and the reliance of one on the judgment and advice of another." *Teadt v Lutheran Church Missouri Synod*, 237 Mich App 567, 580-581; 603 NW2d 816 (1999). "[T]he placement of trust, confidence, and reliance must be reasonable, and placement is unreasonable if the interests of the [parties in question] are adverse or even potentially adverse." *Prentis Family Foundation v Barbara Ann Karmanos Cancer Institute*, 266 Mich App 39, 44; 698 NW2d 900 (2005) (citation omitted). "Whether a [fiduciary] duty exists is a question of law for the court to decide." *Id.* at 43.

In opposing Gould's motion for summary disposition below, Harbor Isles argued that Gould's fiduciary duty arose from the fact that Gould and Harbor Isles both held positions on the

---

[10] The trial court also dismissed the other claims that Harbor Isles alleged against Gould individually, but Harbor Isles has not challenged those determinations on appeal.

management committee for the shared recreational facilities, and that Gould breached that duty by being unresponsive to Harbor Isles when contacted about management committee duties. According to Harbor Isles, this failure to communicate forced them to rely on Gould's decisions, which constituted an abuse of influence. Harbor Isles reiterates this line of argument in its principal brief on appeal. As the SJIYC rec agreement makes clear, however, SJIYC appointed Gould to the management committee to serve as one of its representatives. And neither below nor on appeal has Harbor Isles meaningfully explained how Gould's alleged actions in that representative capacity, objectionable as Harbor Isles may have found them, would give rise to or implicate a fiduciary relationship between Gould and Harbor Isles. It might be that Gould was in such a relationship with SJIYC as its representative on the committee, but Harbor Isles has failed to show why the same would hold true as to Harbor Isles—and furthermore, the instant litigation well illustrates how SJIYC's and Harbor Isles' respective interests may be adverse regarding matters pertinent to the management committee and the shared recreational facilities. See, e.g., *Prentis Family Foundation*, 266 Mich App at 44-45 (explaining how the agency relationship between the defendants did not give rise to rights in the plaintiff and how the interests of the defendants diverged from those of the plaintiff). Harbor Isles cites *Murphy*, 509 Mich 132, but at issue in *Murphy* was the fiduciary duty owed by corporate directors to the shareholders of the corporation. *Id*. at 146. Harbor Isles offers nothing to explain how the relationship between a corporation's director and its shareholders is at all analogous, legally or factually, to Gould's relationship to Harbor Isles in this case.

In its reply brief on appeal, Harbor Isles pivots to a new line of argument, contending that Gould "made himself into a fiduciary by taking over the management committee"—namely, by opening and personally controlling a bank account to use for committee business and denying other committee members access to and information about it. Harbor Isles, however, did not raise this argument in its summary-disposition briefing before the trial court or in its principal brief on appeal; as such, it is not properly presented for this Court's consideration. See *Tolas Oil*, 347 Mich App at 289; *Blazer Foods*, 259 Mich App at 252. And even setting those procedural issues aside, Harbor Isles does not explain how or why the conduct it attributes to Gould renders its claim any more viable; there is still nothing, for instance, to indicate that Gould acted in any capacity other than as SJIYC's representative or was in a fiduciary relationship with Harbor Isles.[11]

---

[11] Harbor Isles cites, with no elaboration, *Smith v Saginaw Savings & Loan Ass'n*, 94 Mich App 263; 288 NW2d 263 (1979). But as with *Murphy*, we do not see how *Smith* provides meaningful support for Harbor Isles' position. The plaintiffs in *Smith* were a couple who borrowed money from the defendant bank to build a home. *Id*. at 266. The plaintiffs "lived some 250 miles from the construction site and Mr. Smith was in poor health and had recently been hospitalized," and so they "were unable to oversee day-to-day activities" on the project. *Id*. at 266, 275. The defendant's branch manager—the plaintiffs' "sole contact in the area and the only emissary of [the defendant] with whom they dealt"—informed them that he would ensure the work was completed properly and within budget, and he personally approved the builder and building agreement and specifications. *Id*. at 266-267, 275. The branch manager hired a builder that was headed for bankruptcy but, despite knowing of that risk, failed to protect the plaintiffs from it; instead, he represented to them that everything was going smoothly while construction fell behind schedule

-10-

In sum, the trial court correctly granted Gould's motion for summary disposition on Harbor Isles' claim of breach of fiduciary duty. Even looking past the preservation and presentation issues in Harbor Isles' arguments on appeal, Harbor Isles has not adequately pleaded or shown that Gould owed a fiduciary duty to Harbor Isles with respect to any of the allegations Harbor Isles has raised against him.

## IV.  SUMMARY DISPOSITION AS TO SJIYC

Lastly, we address Harbor Isles' challenge to the trial court's grant of summary disposition in favor of SJIYC. We review the court's ruling de novo. *LaFontaine Saline*, 496 Mich at 34. In Counts I and III of its complaint, Harbor Isles alleged that SJIYC breached the SJIYC master deed, bylaws, and rec agreement. The trial court granted SJIYC's motion for summary disposition as to these claims under MCR 2.116(C)(8) on the basis that the complaint did not sufficiently allege what SJIYC did to violate those documents.[12]

In its principal brief on appeal, Harbor Isles argues that the trial court erred by granting summary disposition to SJIYC because SJIYC had admitted the existence of a breach-of-contract cause of action in its summary-disposition briefing before the trial court. Specifically, Harbor Isles quotes the portion of SJIYC's briefing in which SJIYC, in describing the parties to the SJIYC rec agreement, called Harbor Isles "the present-day successor in interest of LLM" and discussed how SJIYC "attempted to make final payment of its share of Shared Rec Agreement costs to Harbor Isles Marine." Harbor Isles asserts that SJIYC has thus admitted that Harbor Isles is a party to the SJIYC rec agreement and, through its payment efforts, that there is both a contract with, and a debt owed to, Harbor Isles. Even if this is so, however, Harbor Isles has failed to explain how those admissions would be enough in themselves to state a claim—namely, why an admission to the existence of a contract, or an effort to make payment under that contract, necessarily amounts to an admission of a breach of that contract. And Harbor Isles does not otherwise identify in its principal brief what allegations in its complaint sufficiently alleged that breach, contrary to the trial court's conclusion.

In its response to SJIYC's motion for summary disposition below, Harbor Isles cited to caselaw reflecting the general proposition that a tender of payment "is ordinarily an admission of an amount due equal to the sum tendered[.]" *McKee v Grand Rapids*, 203 Mich 527, 542; 170 NW 100 (1918) (citation omitted). Harbor Isles, however, did not offer that caselaw (or any other) to support its position in its principal brief on appeal, and in any event, that caselaw is not persuasive. While SJIYC does not contest that it attempted to make some measure of payment to

---

and funds were released for work not fully completed. *Id*. at 268, 275. This Court concluded that these "unique facts" were sufficient to "establish[] the existence of a fiduciary obligation" owed by the defendant through its branch manager to the plaintiffs. *Id*. at 274-275. Harbor Isles has offered nothing to explain how the "unique facts" of *Smith* are analogous here or how that case demonstrates that Harbor Isles has adequately pleaded or shown the existence of a fiduciary relationship between itself and Gould.

[12] The trial court also granted summary disposition to SJIYC with respect to Harbor Isles' other claims against it, but Harbor Isles does not challenge that aspect of the court's ruling on appeal.

Harbor Isles, nothing about that in itself is inconsistent with SJIYC's position that it complied with the terms of the SJIYC rec agreement. And at no point has SJIYC admitted that it had tendered payment to Harbor Isles in the amount that Harbor Isles claimed it was owed under the agreement, such that SJIYC could be said to have admitted to owing that claimed amount and thus to breaching the agreement by not paying it. Harbor Isles' principal brief on appeal thus fails to show that the trial court erred in granting summary disposition to SJIYC.

As it did with its appellate reply briefs to Moorings and Gould, however, Harbor Isles attempts to use its reply brief to SJIYC on appeal to advance a new line of argument absent from its principal brief: that Harbor Isles' "biggest issue with SJIYC was SJIYC's unilateral termination of the" SJIYC rec agreement, and the complaint sufficiently alleged that this attempted termination of the rec agreement (and ensuing refusal to pay post-termination expenses under the agreement) violated the terms of the rec agreement. Harbor Isles cites several portions of the complaint that it contends support and sufficiently allege that claim. But once again, the difficulty is that Harbor Isles failed to advance this specific argument in its principal brief on appeal,[13] and so SJIYC correspondingly did not address it in its own appellate brief. It was improper for Harbor Isles to present the issue in this manner, see *Blazer Foods*, 259 Mich App at 252, and in so doing, Harbor Isles both deprived SJIYC of due opportunity to contest the issue on appeal and impaired this Court's ability to meaningfully review it. Harbor Isles offers no reason why we should overlook this significant deficiency in its presentation of the issue on appeal, and we decline to do so.

Affirmed.

/s/ Anica Letica
/s/ Michael J. Kelly
/s/ Philip P. Mariani

---

[13] The closest Harbor Isles comes to raising this issue in its principal brief on appeal is its general assertion that the trial court's ruling "overlooks both the allegations of the Complaint" and "the specific terms of the documents attached and referenced in the Complaint." It was not until its reply brief, however, that Harbor Isles made any attempt to apply this general proposition to the issue of SJIYC's efforts to terminate its rec agreement and the complaint's allegations to that effect. To the extent Harbor Isles could be considered to have generally raised that termination issue in its principal brief, it failed to give the issue anything more than, at very best, "cursory treatment." *Blazer Foods*, 259 Mich App at 252.